990 A.2d 1122 (2010)
201 N.J. 369
STATE of New Jersey, Plaintiff-Respondent,
v.
J.G., Defendant-Appellant.
A-44 September Term 2008.
Supreme Court of New Jersey.
Argued September 30, 2009.
Decided April 7, 2010.
*1123 Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Michele Labrada, Assistant Deputy Public Defender, on the brief).
Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Bruce J. Kaplan, Middlesex County Prosecutor, attorney).
Mary Gibbons Whipple, Chatham, argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Arseneault, Whipple, Farmer, Fassett & Azzarello, attorneys; John C. Whipple, Morristown, Joshua C. Gillette, Newark, and John J. Roberts, Chatham, attorneys, on the brief).
Jeanne Screen, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Anne Milgram, Attorney General, attorney).
Chief Justice RABNER delivered the opinion of the Court.
This case involves what has been described as the most privileged of all communications: private conversations between a penitent and a cleric. Specifically, we are called on to clarify the standard for deciding when the cleric-penitent privilege may be invoked.
*1124 In this matter, defendant J.G. and Pastor Glenford Brown spoke in private about allegations that J.G. had sexually abused his daughters. During their half-hour meeting, the two parties did not explicitly discuss whether the conversation was to be kept confidential, and each left the session with a very different understanding. Pastor Brown later revealed details of the conversation to J.G.'s wife and the police.
J.G. was indicted, and he moved before trial to prevent his statements to Pastor Brown from being introduced in evidence. J.G. argued that the statements were protected by the cleric-penitent privilege. The trial court concluded that the statements were privileged and barred them. The Appellate Division reversed.
In this appeal, J.G. contends that he was seeking help and spiritual counseling during the conversation with Pastor Brown. The State counters that Pastor Brown acted to protect J.G.'s daughters and not for any religious purpose.
The critical question, then, is how to determine whether the privilege can properly be invoked. We hold that the cleric-penitent privilege applies when, under the totality of the circumstances, an objectively reasonable penitent would believe that a communication was secret, that is, made in confidence to a cleric in the cleric's professional character or role as a spiritual advisor.
Applying that standard in a manner consistent with what the trial court stated, we conclude that the privilege applies. Accordingly, we reverse and remand to the trial court for further proceedings.

I.
The following description of events relies on Pastor Brown's testimony at an evidentiary hearing. J.G. and Pastor Brown knew one another for more than thirty years, since J.G. was six years old and the two lived in Jamaica. Pastor Brown oversaw a number of churches in Jamaica, including one J.G. belonged to and attended regularly for a while. Each later moved to New Jersey.
In about 1985, Brown became pastor of the New Creation of Apostolic Faith, a church located in Somerset, New Jersey. Brown's pastoral duties took up only half his time; he was also employed elsewhere as a warehouse supervisor. J.G. was not a member of Brown's New Jersey congregation, but he did attend church there two or three times, and his wife and their two daughters were members.
In May 2000, J.G.'s daughters told their mother that J.G. had sexually abused them. The mother then called Pastor Brown at home to inform him. That same night, Pastor Brown met J.G.'s wife at the church to discuss the details of the allegations. Afterward, Brown felt that he had a duty, as the family's pastor, to protect the children by preventing J.G. from returning home. Brown telephoned for J.G. at work and left two or three messages with another person. The record is ambiguous as to precisely what Pastor Brown said in the messages[1] and how much information *1125 was actually relayed to J.G. J.G. returned Brown's call the following day, and the two arranged to meet.
Later in the day, Pastor Brown met J.G. outside of Brown's home and suggested that they walk to a public play area behind the house to sit and talk. Although Pastor Brown later testified that he would not allow J.G. inside his home, Brown did not say so aloud. As the men walked to the play area, J.G. tried to hold the Pastor's hand. Brown refused, telling J.G. that he did not want anyone "thinking that we're gay."
The two spoke in private in the play area; no one else was there. Pastor Brown asked J.G. how he could have molested his daughters. J.G. attempted to blame his wife. In response, Pastor Brown proclaimed, "if it was [i]n the days of the law in the bible ... I'd kill you myself because I think what you've done is deserving of death." The Pastor also told J.G. that he was a sick man who needed help.
J.G. unsuccessfully tried to convince Pastor Brown to persuade J.G.'s wife and children to let him back into the family's apartment. Without directly admitting the allegations, J.G. said that if anything happened again, they could call the police or the Pastor.
During the conversation, J.G. asked the Pastor to "help" and "counsel" him. Pastor Brown refused, explaining that he was too close to the situation and too angry. The Pastor also believed that he was not qualified to offer the psychological help he thought J.G. needed. Instead, the Pastor offered to find an organization that could counsel J.G. J.G. declined the offer "because he thought [Brown] would have to explain" to others what J.G. had done, "and then he would end up in jail." Pastor Brown replied, "that is probably where you need to be anyway." At some point during the conversation, J.G. asked Pastor Brown to baptize him, but Brown refused.
One or two weeks later, J.G. attended the Pastor's church on a Sunday and again asked to be baptized. Pastor Brown again refused. J.G. also called and spoke twice with the Pastor after their meeting. During the conversations, Pastor Brown encouraged J.G. to surrender to the police. J.G. ultimately agreed. The Pastor offered to escort J.G. to the police station because J.G. feared reprisals from the Jamaican community if he turned himself in.
On June 29, 2000, a Middlesex County grand jury indicted J.G. on four counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a), three counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) and (c), two counts of third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a), one count of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).
J.G. moved to prevent the Pastor from testifying about their conversations at trial. At a pretrial evidentiary hearing, the trial court heard testimony from Pastor Brown. In deciding whether the communications between J.G. and the Pastor were privileged, the court looked to N.J.S.A. 2A:84A-23, which defines the cleric-penitent privilege, and considered the three-prong test outlined in State v. Cary, 331 N.J.Super. 236, 241, 751 A.2d 620 (App.Div.2000). The trial judge found that Brown reached out to J.G., that J.G. had known him as a Pastor for many years, that J.G. desired to be baptized, and *1126 that the two had spoken in private. The court noted that J.G.'s desire to be baptized was critical to its decision. "Looking at the big picture," the court concluded, the communications fell within the privilege and could not be introduced at trial.
The State filed a motion for leave to appeal, which the Appellate Division granted. In a published opinion, State v. J.G., 402 N.J.Super. 290, 298, 953 A.2d 1214 (App.Div.2008), the Appellate Division concluded that the communications between Pastor Brown and J.G. were not privileged and therefore reversed the trial court. The panel reasoned:
Applying the Cary test, we find that although Brown was a cleric and spoke to defendant without anyone else present, (1) defendant did not ask and Brown did not offer to keep the conversation confidential; (2) Brown reached out to defendant  not as a spiritual advisor  but to protect defendant's children; and (3) Brown specifically told defendant he could not counsel him or even baptize him because defendant needed professional help.
[Id. at 298, 953 A.2d 1214.]
This Court granted J.G.'s motion for leave to appeal on October 16, 2008. 196 N.J. 589, 960 A.2d 386 (2008).

II.
J.G. argues that his conversation with Pastor Brown is protected by the cleric-penitent privilege. J.G. submits that when a defendant communicates with a cleric, the defendant's intent must govern as to whether the conversation will remain confidential. J.G. maintains that under the circumstances presented, he reasonably expected that his communications with someone he knew as a Pastor since age six, from whom J.G. was seeking counseling, spiritual guidance, and baptism, would remain private. To the extent there is any ambiguity, J.G. argues that the public interest demands "the tie should go to the penitent." He also contends that if a member of the clergy does not intend to have a confidential, pastoral conversation, the cleric should convey that information at the start, which Brown did not.
The State maintains that the conversation is not protected by the privilege. It argues that privileges are to be narrowly construed as a general rule, and that various aspects of the interaction between Pastor Brown and J.G. demonstrate that their conversation was not protected: Brown's initiation of the meeting; his secular purpose of protecting the children; his decision to meet in a play area to keep J.G. out of his house; Brown's refusal to hold J.G.'s hand; Brown's tone, focus on allegations of sexual abuse, and disgust over J.G.'s behavior; and Brown's refusal to provide counseling or help of a religious nature. Under those circumstances, the State contends there was no need for Pastor Brown to inform J.G. of the obvious  that their conversation was not confidential. Furthermore, the State submits that Brown could not be considered a spiritual advisor during the session.
The State also notes that the privilege protects certain communications, not relationships between a cleric and penitent. The State submits that the overall test for confidentiality should focus on whether it is reasonable under all the circumstances for the holder of the privilege to expect that his or her communications will remain private.
We granted amicus curiae status to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the Attorney General. The ACDL argues that under the facts of this case, J.G. had a reasonable expectation of confidentiality in his communications to Pastor Brown and a reasonable *1127 belief that Brown was serving in the role of a spiritual advisor. More broadly, the ACDL submits that "a penitent has a reasonable expectation of confidentiality in all private and personal conversations with a cleric unless the cleric affirmatively warns the penitent that the communication is not confidential."
The Attorney General contends that the standard to be applied in determining whether communications are privileged "should be based on the totality of the circumstances analysis using an objective reasonable person." The Attorney General maintains that J.G. failed to establish that his communications with Pastor Brown were privileged because J.G. could not reasonably have expected that his communications to Brown were confidential or that Brown was acting as a spiritual advisor.

III.
The cleric-penitent privilege is "rooted in the imperative need for confidence and trust." See Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186, 195 (1980). The privilege "recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." Ibid. Thus, the underlying rationale for the privilege is the public interest in fostering the cleric-penitent relationship.
Justice Garibaldi carefully traced the origins of the privilege and its history in State v. Szemple, 135 N.J. 406, 422-31, 640 A.2d 817 (1994). The cleric-penitent privilege originated with the Catholic seal of confession. Id. at 423, 640 A.2d 817. Under the Code of Canon Law of the Roman Catholic Church, it was a crime, punishable by excommunication, for a priest to break the seal of the confessional by revealing information acquired during a confession. Ibid. (citation omitted).
As Justice Garibaldi further explained, "[t]he sanctity of the confession was recognized in English law from the Norman Conquest in 1066 until the English Reformation in the Sixteenth Century. After the Reformation, hostility towards the Catholic Church in England resulted in a refusal to recognize the privilege." Ibid. (citation omitted). As a result, the cleric-penitent privilege did not exist as part of the common law when our nation was founded. Ibid.; see also State v. Morehous, 97 N.J.L. 285, 295, 117 A. 296 (E. & A.1922). Courts in New Jersey and elsewhere thus looked to developing statutory law as the basis for the privilege.
New Jersey first recognized the privilege by enacting a statute in 1947. See L. 1947, c. 324 (N.J.S.A. 2A:81-9 (1947)). The law provided that
[a] clergyman, or other minister of any religion, shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the course of discipline enjoined by the rule or practice of the religious body to which he belongs or of the religion which he professes.
[Ibid. (emphasis added).]
As the text reveals, the statute hewed closely to religious doctrine: it protected only confessions, and it expressly linked them to situations prescribed by the rule or practice of a religious body.
The Evidence Act of 1960 repealed and expanded the 1947 statute. See L. 1960, c. 52, § 23 (N.J.S.A. 2A:84A-23 (1960)). The new law  labeled the "priest-penitent privilege"  read as follows:
Subject to Rule 37 [relating to waiver of the privilege], a clergyman, minister or *1128 other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.

[L. 1960, c. 52, § 23 (N.J.S.A. 2A:84A-23 (1960)) (emphasis added).]
The new statute thus expanded the privilege in a number of significant ways. It extended the privilege to a broader group of religious figures  "a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion." Ibid. It protected from disclosure not only confessions but also "other confidential communication[s]." Ibid.[2] In addition, it deleted the phrase "enjoined by the rules" of the religious body, thereby removing language that tied protected communications to the prescribed rules of a religion. Ibid.
In 1981, the Legislature again expanded the privilege by adding to the 1960 statute the language underscored below:
Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counseling role.

[L. 1981, c. 303, § 2 (N.J.S.A. 2A:84A-23 (1981)) (emphasis added).]
The new law was part of a legislative package that originated with proposed changes to the psychologist-patient privilege. S. 1295 (Sponsor's Statement), 199th Leg. (N.J. May 19, 1980). Previously, confidential relations and communications between psychologists and individuals were protected; the new statute enacted in 1981 covered communications with couples, families, and groups. L. 1981, c. 303, § 2 (N.J.S.A. 2A:84A-23 (1981)). To bring about that change, Senator Matthew Feldman initially introduced legislation to amend only the Practicing Psychology Licensing Act. S. 1295 (Sponsor's Statement), 199th Leg. (N.J. May 19, 1980). His bill was referred to the Senate Committee on Labor, Industry, and Professions where it was amended "to provide similar confidentiality for duly ordained ministers of religion exercising their professional counseling roles." S. Labor, Indus. & Professions Comm. Statement to S., No. 1295 with S. Comm. Amendments, 199th Leg. (N.J. Dec. 11, 1980). An Assembly statement about Senate Bill 1295 explained that "[t]he increasing proliferation of group therapy, marriage counseling, family therapy and other types of group therapy has created a need to broaden the existing confidentiality provisions." Assem. Commerce, Indus. & Professions Comm. Statement to S., No. 1295, 199th Leg. (N.J. June 15, 1981). Thus, the expansion of the *1129 priest-penitent privilege in 1981 was driven by changes to the psychologist-patient privilege and not by religious doctrine or practice.
The 1981 revision paralleled the psychologist-patient privilege in one other way: it protected both communications and the fact that a confidential relationship existed between a cleric and a penitent. L. 1981, c. 303, §§ 1-2 (N.J.S.A. 45:14B-28 and 2A:84A-23 (1981)); Cary, supra, 331 N.J.Super. at 240-41, 751 A.2d 620.
When the current rules of evidence were adopted on July 1, 1993, the cleric-penitent privilege found at N.J.S.A. 2A:84A-23 was included without change as N.J.R.E. 511.
This Court addressed the privilege in Szemple in 1994, when it considered whether the cleric or the penitent held the privilege. 135 N.J. 406, 640 A.2d 817. In a 4-3 decision, the Court held that the cleric was the sole holder of the privilege and that he or she alone could decide whether to waive it and disclose confidential communications. Id. at 429-30, 433, 640 A.2d 817. Justice O'Hern dissented and explained that the "clergy privilege exists not for the cleric to choose among the worthy members of the flock but to furnish a secure repository for the confessant's confidences." Id. at 444, 640 A.2d 817 (internal quotation marks and citation omitted) (O'Hern, J., dissenting).
In response to Szemple, the Legislature once again expanded the privilege. It overturned Szemple and amended N.J.S.A. 2A:84A-23 to read:

Any communication made in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes, shall be privileged. Privileged communications shall include confessions and other communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role.

As used in this section, "cleric" means a priest, rabbi, minister or other person or practitioner authorized to perform similar functions of any religion.
The privilege accorded to communications under this rule shall belong to both the cleric and the person or persons making the communication and shall be subject to waiver only under the following circumstances:
(1) both the person or persons making the communication and the cleric consent to the waiver of the privilege; or
(2) the privileged communication pertains to a future criminal act, in which case, the cleric alone may, but is not required to, waive the privilege.
[N.J.S.A. 2A:84A-23; N.J.R.E. 511 (emphasis added).]
The 1994 amendment thus brought about several important changes. First, the Legislature provided that both the cleric and penitent hold the privilege and that neither alone may waive it  except for communication of a future criminal act. L. 1994, c. 123, § 1 (N.J.S.A. 2A:84A-23). Second, the amendment introduced the generic term "cleric" and defined it to include priests, rabbis, ministers, and other religious practitioners. N.J.S.A. 2A:84A-23; Cary, supra, 331 N.J.Super. at 241, 751 A.2d 620 (quoting Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 511 (2000)). Third, the amendment broadened the rule to refer to "[a]ny communication made in confidence to a cleric in the cleric's professional character." L. 1994, c. 123, § 1 (N.J.S.A. 2A:84A-23). The Legislature also described *1130 "privileged communications" without using words of limitation; instead, it noted the term "shall include" confessions, counseling, and other communications. Ibid. Fourth, the Legislature did not include language from the 1981 amendment which protected even the fact that a confidential relationship exists between a cleric and penitent. Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 511 (2009).
The dissent understands the statutory changes from 1947 to the present to mean that the Legislature "took pains to tether the existence of the privilege firmly to its religious moorings," post at 396, 990 A.2d at 1138, and "has steadfastly required that any such privilege claim be closely aligned to a religious practice," id. at 397, 990 A.2d at 1139. In actuality, the development reflects a broad change over time from the privilege's strict religious roots  expanding the privilege from a protection for confessions made to clergy in 1947, as "enjoined by the rules" or practice of a religious body, to the current protections afforded to professional counseling for couples, families, or groups, which reflect a cleric's broader role. The rule still considers whether a communication was made in connection with the practice of religion, but it is no longer anchored to religious rules or doctrine. Moreover, as the legislative history reveals, certain changes had little to do with religious rules or practice.
New Jersey is not alone in the path the Legislature has followed. As noted in one article surveying the privilege and its history,
[t]he priest-penitent privilege grew out of the need to protect the uniquely Catholic confessions made within a confessional, which Catholic priests were obligated by canon law to keep secret. ...
Today, however, the privilege is extended to protect conversations between spiritual leaders of non-Catholic Western religious groups and followers of those religions. ...
. . . .
The central policy behind the privilege today is no longer to preserve the free exercise of religion that would be hampered if Catholic priests were forced, despite religious rules, to disclose confidential communications made within the confines of the confessional. Today, the most important and powerful justification for the privilege is that the community believes the relationship between priest and penitent is significant and worth fostering.
[Chad Horner, Note, Beyond the Confines of the Confessional: The Priest-Penitent Privilege in a Diverse Society, 45 Drake L.Rev. 697, 729-30 (1997).]

IV.
We turn now to delineate the boundaries of N.J.S.A. 2A:84A-23 for the first time since the statute was amended in 1994.
As a general rule, we construe testimonial privileges narrowly because they prevent the trier of fact from hearing relevant evidence and thereby "undermine the search for truth in the administration of justice." State v. Williams, 184 N.J. 432, 444, 877 A.2d 1258 (2005) (quoting State v. Dyal, 97 N.J. 229, 237, 478 A.2d 390 (1984)). As a result, courts sensibly accommodate privileges to the "aim of a just result," State v. Briley, 53 N.J. 498, 506, 251 A.2d 442 (1969), and accept them to the extent they outweigh the public interest in full disclosure. See Szemple, supra, 135 N.J. at 413-14, 640 A.2d 817.
The statute itself provides the basic framework for determining when the cleric-penitent privilege may be invoked. As the Appellate Division recognized in Cary, supra, the language of N.J.S.A. 2A:84A-23 *1131 outlines three requirements that must be present for the privilege to apply: the communication must be made (1) in confidence, (2) to a cleric, (3) in the cleric's professional character or role as a spiritual advisor. 331 N.J.Super. at 241, 751 A.2d 620.
In evaluating whether the privilege should be invoked, some courts have employed an objective standard. In other words, they have focused on whether communications were made with a reasonable expectation of confidentiality. See, e.g., id. at 239-40, 246, 751 A.2d 620 (finding that communications to pastor and deacon, who was also State Trooper, made after deacon searched defendant and advised him of his right to remain silent, were not privileged because defendant could not have reasonably expected that his communications would remain confidential); State v. List, 270 N.J.Super., 169, 174-75, 636 A.2d 1054 (App.Div.1993) (finding that defendant's letter to his pastor, "left for anyone to find and read" in unsealed file folder in a file cabinet in defendant's abandoned house, was not made with "a reasonable expectation of confidentiality"); see also In re Grand Jury Investigation, 918 F.2d 374, 377 (3d Cir.1990) (holding that clergy-communicant privilege protects persons "who reasonably expect that their words will be kept in confidence").
We agree that the test should be an objective one. An objective reasonableness standard that allows for consideration of all the facts lends itself to the varied exchanges between clerics and penitents. Indeed, the nature of those conversations may be as diverse as the individuals who engage in them. An objective approach also separates idiosyncratic views from reasonable ones and disregards subjective thoughts that are not conveyed. In addition, a fact-sensitive analysis avoids bright-line rules that would extend the privilege to all communications between a penitent and a cleric, regardless of whether they meet the statutory test. The flexibility of an objective reasonableness standard would allow courts to draw distinctions  if appropriate based on the facts of a case  between a casual conversation with a cleric at a public, crowded sporting event and a private meeting with a pastor in connection with a religious practice or counseling session.
In evaluating whether the cleric-penitent privilege applies, therefore, courts should use Cary's three-part test and employ an objective standard that encompasses all the facts presented. We believe that the proper test is as follows: Would an objectively reasonable penitent, under the totality of the circumstances, believe that a communication was secret, that is, made in confidence to a cleric in that cleric's professional character or role as spiritual advisor?
On balance, such a standard affords proper respect both to the search for the truth and to what Justice O'Hern described as "the most privileged of all communications." Szemple, supra, 135 N.J. at 441, 640 A.2d 817 (O'Hern, J., dissenting).
The dissent proffers a different test. It explains that "civil law will protect those communications between a cleric and a penitent made in confidence under circumstances where religious dogma bars disclosure." Post at 392, 990 A.2d at 1136. Accordingly, "invocation of the privilege must be moored to the confidentiality requirements of specific religious tenets." Id. at 398, 990 A.2d at 1139.
That approach misinterprets what the Legislature has accomplished since 1947 and misreads existing law. To see why, we apply the dissent's test to a practicing Roman Catholic, using the parameters the dissent outlines. "If a communication *1132 would not be deemed privileged by the relevant religious authorities ... then it should not be deemed privileged by civil authorities." Id. at 402, 990 A.2d at 1142. According to the dissent, "Roman Catholicism grants absolute confidentiality only to those communications made under the seal of confession." Id. at 399, 990 A.2d at 1140 (citation omitted). Assuming that is correct, it would therefore follow that only communications made under the seal of the confessional would be protected under N.J.R.E. 511.
That view ignores the plain language of the statute and evidence rule. The privilege is no longer "enjoined by the rules" of a "religious body," as was the case in 1947. Under the current statute, for example, the privilege specifically extends to "communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role." N.J.R.E. 511. That rule of confidentiality, therefore, applies even if Canon Law does not extend that far. See post at 399, 990 A.2d at 1139.
The Legislature was well within its right to make judgments about the scope of the cleric-penitent privilege. It could determine, as it did, that confidences in addition to those conveyed in the confessional should be addressed  that confidences relayed to a cleric during group or family counseling are worth protecting from disclosure in court. The Judiciary is obligated to respect that determination. Moreover, the Legislature's statutory changes demonstrate profound respect for the role of religion, religious practice, and religious leaders in our society, according communications with penitents far greater protection today than they had sixty years ago. But the amendments do not establish religious law as the foundation for evidence rules used in civil and criminal courtrooms.
The dissent's test is problematic in another regard. Its test "must be grounded on the fundamental tenets and practices of the religious belief represented by the cleric and espoused by the penitent." Id. at 392-93, 990 A.2d at 1136. As a result, civil judges attempting to apply such a test would first have to identify and define the specific religious tenets of a particular religion, which may not always be readily apparent. The statute does not call for that approach, and it might well raise constitutional questions that are not now before the Court. See Klagsbrun v. Va'ad Harabonim of Greater Monsey, 53 F.Supp.2d 732, 739-42 (D.N.J.1999) (dismissing defamation claim that arose from dispute over religious divorce under Jewish law ("Get") on First Amendment grounds, because "questions of religious doctrine permeate" complaint and resolving claim would "delve dangerously into questions of doctrine and faith"), aff'd o.b., 263 F.3d 158 (3d Cir. 2001); Abdelhak v. The Jewish Press, Inc., 411 N.J.Super. 211, 217, 985 A.2d 197 (App.Div.2009) (dismissing defamation claim that would invite excessive entanglement contrary to First Amendment, because jury could not evaluate claim involving Get "without developing a keen understand of religious doctrine, and without applying such religious doctrine to the facts presented"); see also Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 450, 89 S.Ct. 601, 607, 21 L.Ed.2d 658, 666 (1969) (noting that while civil courts may apply neutral principles of law to resolve church property disputes, they may not "determine matters at the very core of religion  the interpretation of particular church doctrines and the importance of those doctrines to the religion" because "[p]lainly, the First Amendment forbids civil courts *1133 from playing such a role"); McKelvey v. Pierce, 173 N.J. 26, 45, 800 A.2d 840 (2002) (noting distinction between secular disputes, capable of review by civil courts, and ecclesiastical ones about ecclesiastical rule, custom, or law, which are not).[3] That is not to suggest that a court, in evaluating the totality of the circumstances, cannot consider a proffer of evidence about religious practices that are relevant to the particular interaction between the cleric and penitent. To the extent that the proffer bears on the penitent's objectively reasonable belief, the evidence should not be foreclosed. See Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 414, 593 A.2d 725 (1991) ("[C]ourts can and do decide secular legal questions in cases involving some background issues of religious doctrine, so long as the courts do not intrude into the determination of the doctrinal issues."). Thus, for example, if relevant to determine a penitent's objectively reasonable belief, it would not be improper to consider basic background information about the practice of going on the Hajj, a pilgrimage to Mecca, so long as a court did not attempt to decide whether that practice constituted a doctrinal tenet of Islam.

V.
It is unclear whether the trial court followed the objective reasonableness approach outlined in section IV. The court appropriately "look[ed] at the big picture"  the totality of the circumstances  but the record does not reveal the test it applied. Although the court may have tested the facts against the benchmark we have announced, we cannot be sure that it did so. As a result, we now apply the above standard in keeping with what the trial court said and conclude that there is ample support in the record for the court's conclusion that the privilege applies.
As to the first prong of the privilege  whether the communication was made in confidence  an objective penitent in J.G.'s position could reasonably have thought that the communication would remain confidential in light of several facts.
First, although the privilege is designed to protect communications and not relationships, the nature of the relationship between a cleric and penitent can be a relevant consideration. That is particularly true in this case, in which the parties knew one another and interacted in a religious context for decades. J.G. was a member of Pastor Brown's church in Jamaica, had attended Brown's church in New Jersey two or three times, and was aware that his family belonged to that congregation.
The trial court found and weighed heavily the fact that J.G. knew Brown as a pastor for many years. Its factual findings should not be disturbed on appeal so long as they are "supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243, 927 A.2d 1250 (2007) (citations omitted). A trial court's findings may only be disturbed "if they are so clearly mistaken `that the interests of justice demand intervention and correction.'" Id. at 244, 927 A.2d 1250 (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).
*1134 Under the circumstances, it is reasonable to conclude that after receiving a message from Pastor Brown, someone in J.G.'s position would believe that he had been summoned by a cleric, not a secular figure or warehouse supervisor. The State places great weight on the fact that Brown reached out to J.G. and not the other way around, but the nature of the interaction is more telling than who initiated it.
Second, Pastor Brown and J.G. met and spoke in private. The trial court "perceived [that the communication] was done in confidence, not in front of everybody but in a very quiet place." At the evidentiary hearing, the Pastor explained that he chose the park area near his townhouse because he did not want J.G. to enter his home. That is irrelevant under an objective reasonableness standard, which cannot rely on subjective, unspoken thoughts revealed only after the fact.
Third, based on the exchange that took place, it was apparent that J.G. expected the conversation would remain confidential. In particular, he declined the Pastor's offer to find a group that could provide counseling because J.G. feared Brown "would have to explain" what had happened "and then [J.G.] would end up in jail." J.G. plainly did not want others to know what they were discussing. By not dispelling that expectation, Pastor Brown made it appear reasonable. J.G. did not have to ask Brown specifically to keep their exchange private.
We do not suggest that communications will always be deemed confidential unless a cleric affirmatively states otherwise  a bright-line rule advanced by the ACDL. For any number of reasons, it would be inappropriate for courts to script conversations between penitents and clergy and require specific disclaimers. For similar reasons, we do not insist on a formulaic request by the penitent, or an offer by the cleric, to keep communications between them confidential. However, when the nature of a given conversation invites a response  as happened here  silence may be considered in gauging the reasonableness of a penitent's view.
The State conceded the second prong of the privilege and does not dispute that Pastor Brown is a cleric.
As to the third prong  whether Pastor Brown was acting in a cleric's professional character or role as a spiritual advisor  a reasonable penitent could have concluded that Brown was serving in that capacity. Looking at the meeting as it unfolded, Pastor Brown first refused J.G.'s effort to hold his hand. One could view J.G.'s gesture as reaching out for consolation or absolution. Brown thought that J.G. acted "like he was weak." Brown's response  telling J.G. that he did not want anyone "thinking that we're gay"  sheds no light on the applicability of the privilege. If Brown harbored another, subjective reason, it would have no bearing if not conveyed.
Next, toward the outset of the conversation, Brown set the tone by invoking biblical law to condemn J.G.: "[I]f it was [i]n the days of the law in the bible[,] I told him I'd kill you myself because I think what you've done is deserving of death." That statement, viewed objectively, clouds Brown's professed secular purpose of protecting the children. Instead, it suggests he was there in his professional role as a religious figure. A cleric may choose to rebuke a penitent in the context of a sacred relationship. That practice is part of a long tradition rooted in various religious faiths. As an example familiar to many, a modern-day cleric in the style of Pastor Jonathan Edwards  whose fiery sermons warned of divine wrath, see George Anastoplo, *1135 Constitutionalism, The Rule of Rules: Explorations, 39 Brandeis L.J. 17, 62 (2001) (citations omitted)  could still be considered a spiritual advisor.
Furthermore, during the course of the meeting and afterward, J.G. sought spiritual advice and counseling from Pastor Brown and asked to be baptized multiple times. Brown's refusal might lend support to the State's position that the Pastor was acting in a secular, and not a clerical, role. The ACDL, on the other hand, points out that a cleric's refusal to grant forgiveness does not necessarily strip a penitent's admissions and plea for help of protection. Indeed, Brown himself conceded that as part of his regular pastoral duties, he does refuse to baptize people. Faced with different views, the trial court was well within its right to rely on J.G.'s requests to be baptized in concluding his communications were privileged. See Elders, supra, 192 N.J. at 243, 927 A.2d 1250. The trial court considered that theme "critical in [its] decision."
The State argues that Magar v. State, 308 Ark. 380, 826 S.W.2d 221 (1992), helps demonstrate that the privilege does not apply in light of the facts of this case. The Appellate Division also referenced Magar in support of its conclusion. J.G., supra, 402 N.J.Super. at 296-97, 953 A.2d 1214.
Magar involved similar facts. A pastor asked defendant Magar to meet with him and then confronted Magar with allegations of sexual abuse. Magar, supra, 826 S.W.2d at 222. Magar admitted the allegations. Ibid. Although the pastor and Magar had engaged in many private counseling sessions in the recent past, the Supreme Court of Arkansas placed great weight on the pastor's view that the meeting was disciplinary in nature and not a spiritual counseling session. Id. at 222-23. In a divided decision, the Court declined to exclude the pastor's testimony at trial. The two dissenting justices faulted the majority's approach because it "dwells on [the pastor's] expectations rather than those of Magar," yet "it is Magar's expectations that count under the [Arkansas] Rule." Id. at 225-26 (Newbern, J., dissenting).
The standard we announce today follows neither course applied in Magar. For that reason, Magar does not control the outcome here. Rather than focus on the subjective views of a penitent or cleric in deciding whether the privilege applies, judges are to consider the objectively reasonable expectations of the penitent in light of all the circumstances. Under that standard, the communications between Pastor Brown and J.G. in this case were privileged, as the trial court concluded.[4]

VI.
For the reasons set forth above, we reverse the judgment of the Appellate Division and remand to the trial court for further proceedings consistent with this opinion.
*1136 Justice RIVERA-SOTO, dissenting.
N.J.S.A. 2A:84A-23 and N.J.R.E. 511 codify a privilege firmly rooted in tradition and common sense: civil law will protect those communications between a cleric and a penitent made in confidence under circumstances where religious dogma bars disclosure. That tradition and common sense, however, draw their foundation from the acknowledgement of and the respect accorded to core religious tenets. Ignoring that fundament, the majority has adopted a rule that hermetically insulates the cleric-penitent privilege from its origins, eschews the privilege's clear tradition, and ignores the statutory mandate.
Based on an unexpressed but nevertheless palpable fear of entangling itself in religious controversy, the majority has secularized this religion-based privilege, concluding expansively that "the cleric-penitent privilege applies when, under the totality of the circumstances, an objectively reasonable penitent would believe that a communication was secret, that is, made in confidence to a cleric in the cleric's professional character or role as a spiritual advisor." Ante at 372-73, 990 A.2d at 1124. That conclusion stretches the narrow cleric-penitent privilege far past its moorings and renders it untethered to its roots. Because we speak of the cleric-penitent privilege, the majority's standard perforce must be grounded on the fundamental tenets and practices of the religious belief represented by the cleric and espoused by the penitent, the objective facts surrounding the communications, the identity and purpose of the initiator of the communications, and any exchanges between the cleric and the penitent directly relevant to their spiritual relationship after the communications for which the privilege has been claimed have concluded. Anything else renders the "cleric" portion of the privilege surplusage, leaving only a generalized, utterly rootless and dangerously limitless "confidentiality" privilege.
Moreover, the majority  although adopting a new rule of law and without assessing whether that rule should be afforded full retroactivity, pipeline retroactively, purely prospective effect or prospective application  has applied its new standard to the facts as developed under a different rule of law to "conclude that the privilege applies." Ante at 373, 990 A.2d at 1124. By denying these litigants the ability to develop and test their facts against this new standard, the majority has not rendered a judgment; it has issued a decree.
Both of those conclusions are in error. I, therefore, respectfully dissent.

I.
Any discussion of evidentiary privileges must start with the "fundamental principle that `the public ... has a right to every man's evidence.'" Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (quoting United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884, 891 (1950)). The guiding precepts that govern the assertion of a claim of privilege are clear:
We begin our analysis by reviewing well-established principles regarding evidentiary privileges. As a general proposition, privileges are to be narrowly construed. That rule of construction stems from the fact that privileges contravene the fundamental principle that the public has a right to every man's evidence. They are obstacles in the path of the normal trial objective of a search for ultimate truth.
Because privileges may often undermine the search for truth in the administration of justice, they are accepted only to the extent that they outweigh *1137 the public interest in the search for truth. They are accepted only because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure. Thus, privileges should always be construed and applied in sensible accommodation to the aim of a just result.
[State v. Szemple, 135 N.J. 406, 413-14, 640 A.2d 817 (1994) (citations, internal quotation marks and editing marks omitted).]
Those guiding precepts then must be applied within the context and in respect of the purpose for which a privilege is asserted. When, as here, there has been an assertion of the priest-penitent or cleric-penitent privilege, one cannot ignore that specific privilege's origins and purpose:
The prospect of clergy going to jail to comply with their religious beliefs rather than disclosing a penitent's confession resulted in various religious groups bringing pressure ... to enact a clergyperson privilege. Thus, the origin of the priest-penitent privilege as well as the moving force behind the enactment of the statutory privilege was to protect the clergyperson from being forced against his or her will to reveal confidences.
[Id. at 424, 640 A.2d 817 (citation omitted) (emphasis in original).]
In the aggregate, those are the principles that must guide our discussion.

A.
The Supreme Court of the United States early asserted that, as a matter of common law, "suits cannot be maintained which would require a disclosure of the confidences of the confessional[.]" Totten v. United States, 92 U.S. 105, 107, 23 L.Ed. 605, 605 (1876). In New Jersey, however, a different understanding of the common law then obtained in respect of the confidentiality accorded as a matter of law to cleric-penitent communications. Our case law explains plainly that "[n]o privilege of this nature exited at common law[ and, prior to 1947, t]here is no statute in New Jersey bestowing such a privilege." State v. Morehous, 97 N.J.L. 285, 295, 117 A. 296 (E. & A.1922) (citations omitted). That void was filled in 1947, when the Legislature adopted the following priest-penitent privilege:
A clergyman, or other minister of any religion, shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the course of discipline enjoined by the rules or practices of the religious body to which he belongs or of the religion which he professes.
[L. 1947, c. 324, § 1 (eff. Jun. 20, 1947), codified at R.S. 2:97-5.1, later codified at N.J.S.A. 2A:81-9.]
See also Szemple, supra, 135 N.J. at 423-24, 640 A.2d 817 ("When this country was founded, therefore, the privilege did not exist at common law. ... New Jersey did not recognize the privilege until it was created by statute in 1947.") By its explicit terms, the 1947 priest-penitent privilege limited its reach only to confessions made within a specific religious context.
Some thirteen years later, as part of the adoption of the Evidence Act of 1960, L. 1960, c. 52, § 1 to § 53, the Legislature restated and re-codified the then named priest-penitent privilege as Evidence Rule 29 as follows:
Subject to Rule 37,[1] a clergyman, minister or other person or practitioner authorized *1138 to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.
[L. 1960, c. 52, § 23 (eff. Jun. 20, 1960), codified at N.J.S.A. 2A:84A-23 and Evidence Rule 29.]
Again, the priest-penitent privilege embodied in former Evidence Rule 29 remained moored firmly to a "confession or other confidential communication made ... in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes." As In re Murtha, 115 N.J.Super. 380, 385, 279 A.2d 889 (App.Div.), certif. denied, 59 N.J. 239, 281 A.2d 278 (1971), cogently explained:

Evidence Rule 29 obviously broadened the privilege to include not only a clergyman or minister, but any "other person or practitioner authorized to perform similar functions" of any religion. Moreover, the rule now prohibits not only the disclosure of a confession, but also any "confidential communication" made to any such designated person in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes.[2]
Twenty-one years after the adoption of the Evidence Act of 1960, the Legislature again addressed the priest-penitent privilege, amending Evidence Rule 29 to read as follows:
Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and the individuals, couples, families or groups with respect to the exercise of his professional counseling role.

[L. 1981, c. 303, § 2 (eff. Nov. 11, 1981), codified at N.J.S.A. 2A:84A-23 and Evidence Rule 29 (added language underscored).]
Tellingly, the Legislature again took pains to tether the existence of the privilege firmly to its religious moorings.
This historical trail leads to the current iteration of the now-called cleric-penitent privilege.[3] In 1994, the Legislature renamed *1139 the privilege the "cleric-penitent" privilege to provide that "[a]ny communication made in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes, shall be privileged." L. 1994, c. 123, § 1 (eff. Oct. 26, 1994), codified at N.J.S.A. 2A:84A-23 and N.J.R.E. 511. The privilege retained the substance of the additions made in 1981, providing that "`cleric' means a priest, rabbi, minister or other person or practitioner authorized to perform similar functions of any religion[,]" and that "[p]rivileged communications shall include confessions and other communications made in confidence between and among the cleric and individuals, couples, families or groups in the exercise of the cleric's professional or spiritual counseling role." Ibid.[4] Again, the invocation of the cleric-penitent privilege remained inextricably tied to a communication made "in confidence to a cleric in the cleric's professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes [.]" Ibid. (emphasis supplied).
The lesson learned from the development of the privilege in New Jersey is clear. Although the Legislature has expanded the scope of the priest-penitent  or the now cleric-penitent  privilege from its early "seal of confession" origins, it has steadfastly required that any such privilege claim be closely aligned to a religious practice; confidentiality alone is insufficient to invoke the privilege.

B.
By stating that it "applies when, under the totality of the circumstances, an objectively reasonable penitent would believe that a communication was secret, that is, made in confidence to a cleric in the cleric's professional character or role as a spiritual advisor[,]" ante at 373, 990 A.2d at 1124, the majority's newly stated standard turns the cleric-penitent privilege on its head, secularizes an otherwise religion-based privilege, and sterilizes it from its religious foundations. The better rule is to remain true to the privilege's limited purpose  and thereby also honor the principle that privileges are to be applied narrowly  and continue to require that the invocation of the privilege must be moored to the confidentiality requirements of specific religious tenets.
It has been noted most persuasively that
[i]n determining whether a clergy-communicant privilege exists, we weigh *1140 Dean Wigmore's four fundamental prerequisites for a privilege against the disclosure of communications:
(1) The communications must originate in a confidence that they will not be disclosed.
(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
(3) The relation must be one which in the opinion of the community ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.
[In re Grand Jury Investigation, 918 F.2d 374, 383-84 (3d Cir.1990) (citation omitted; emphasis in original).]
The first two prerequisites speak to the same point: a statement made in confidence under a well-founded expectation of confidentiality. And, in order to be well-founded, any expectation of confidentiality must trace its genealogy directly to a recognized religious tenet. As one commenter has explained:
The confidentiality requirement imposes further limits on the privilege: only that communication which is a cleric is prohibited by the dictates of his religion from disclosing should be deemed privileged. In the absence of such an obligation on the part of the cleric, the privilege's claimant (the penitent) cannot argue that confidentiality was both expected and necessary. ... [C]ommunications lacking ... a guarantee of confidentiality cannot be considered privileged. As only those communications in which secrecy on the part of the cleric is required by the dictates of the cleric's religion satisfy this requirement, only those communications ought to be considered privileged.

[Ronald J. Colombo, Note, Forgive Us Our Sins: The Inadequacies of the Clergy-Client Privilege, 73 N.Y.U. L.Rev. 225, 246-47 (1998) (footnote omitted; emphasis supplied).]
Thus, in striking the necessary balance in determining whether a cleric-penitent communication is worthy of the privilege, it is entirely right and proper under New Jersey's statute and Rule of Evidence "to exclude those religions that do not require confidentiality and include[e] those that do[.]" Chad Horner, Note, Beyond the Confines of the Confessional: The Priest-Penitent Privilege in a Diverse Society, 45 Drake L.Rev. 697, 729-30 (1997) (suggesting that privilege should apply only "if the religious tenets of a clergyperson's religion prohibit under all circumstances disclosure of such communications" (emphasis supplied)).
In light of the variety of religious beliefs that today find respectful expression in our society, the notion that a claim of cleric-penitent privilege must be rooted firmly in the religious mores of the cleric is not only compelled by our statutory history and structure, it is self-evident. Without purporting to exhaust all relevant religions, reference to the tenets of a few major religions is illustrative. For example, Roman Catholicism grants absolute confidentiality only to those communications made under the seal of confession. See Robert John Araujo, S.J., International Tribunals and Rules of Evidence: The Case for Respecting and Preserving the "Priest-Penitent" Privilege Under International Law, 15 Am. U. Int'l L.Rev. 639, 643-48 (1999-2000) (describing origins of priest-penitent privilege). Yet, although contrary to Catholic dogma, the majority's iteration of the principle would shield even non-confessional conversations between a priest and *1141 a penitent, a result far outside Roman Catholic Canon Law and far broader than the universe of communications the privilege originally was intended to protect. Thus, under the majority's iteration of the cleric-penitent privilege, an odd and topsy-turvy result obtains: an observant Buddhist speaking "in confidence" with a Roman Catholic priest successfully may assert the privilege even though the Code of Canon Law to which that Roman Catholic priest must abide does not require any such confidentiality.
Other Christian denominations may fare differently. Because some "Protestant clergy cannot claim that religious law prevents them from testifying[,]" Horner, supra, 45 Drake L.Rev. at 729 (emphasis in original), the only basis for the assertion of the privilege in that setting is not religious, but some ill-defined promise of confidentiality. That basis, however, is entirely illusory: "Merely promising a penitent that a confession will be kept secret should not protect the communication. Often people make promises not to divulge information. Their promises, however, cannot withstand a court subpoena. The difference [in allowing the privilege] is simply that the context is religious." Ibid. (emphasis supplied).
Similarly, "Muslims are required to treat other people's confidences with the utmost respect. Prophet Muhammad calls such confidences `trusts.'" Azizah al-Hibri, The Muslim Perspective on the Clergy-Penitent Privilege, 29 Loy. L.A. L.Rev. 1723, 1725 (1995-96) (footnote omitted). Thus, "observing the relationship of trust is very important in Islam, and is the duty of every Muslim." Ibid. Yet, despite this overarching duty of confidentiality, a Muslim to whom a murderer has confessed "has no option but to advise [the murderer] to confess and to inform the authorities of the confession if [he] refuses to do so himself." Id. at 1731. This is so because "[m]urder is viewed in Islam as such a heinous crime that it would provide sufficient justification for overriding the confidentiality requirement." Id. at 1732. See also People v. Johnson, 115 A.D.2d 973, 497 N.Y.S.2d 539, 539-40 (1985) (holding that "confidential communications between a Muslim brother acting as a spiritual advisor may, in some cases, be privileged" and that "[f]or communications to be privileged, they must have been made with the purpose of seeking religious counsel, advice, solace, absolution or ministration [and t]hey must also have been made with the intention that they remain confidential" (citations and internal quotation marks omitted)). It is in respect of Islam that the illogic resulting from the majority's religion-adverse statement of the privilege starkly comes into focus: a Muslim, who is duty-bound by his faith to disclose a murderer's confession, will be barred from making that disclosure by the assertion of a privilege originally founded on a deep and abiding respect for religious beliefs. That result needlessly pits civil law antagonistically against one of the World's major religions; it cannot be sustained.
Likewise, based generally on the Biblical injunctions that "justice, justice thou shall pursue[,]" Deuteronomy 16:20, and the direct commandment to Moses that "you shall not stand aside while your fellow's blood is shed[,]" Leviticus 19:16, Judaism imposes the prohibitory law of Lo Ta'amod Al Da'am Reiacha, pursuant to which "Maimonidies ruled that one who is in a position to save another by reporting on a wrongdoer, and refrains from doing so, has violated the prohibition of standing idly by." Israel M. Greisman, Comment, The Jewish Criminal Lawyer's Dilemma, 29 Fordham Urb. L.J. 2413, 2432 (2001-2002) (citing Maimonidies, Mishna Torah Hilchos Rotzeiach 1:14). Arising out of that passage in Leviticus, Jewish law implies *1142 that "you should always keep confidences, but only to the extent that such will not present a danger to others." Id. at 2433 (citing Rabbi Ovadia Yossef, Yechava Daas 4:60).
Suffice it to note that even less "mainstream" religions treat certain communications between parishioners and clergy as confidential. See, e.g., Natasha Bita, Scientologists in Privilege Claim, The Australian, Oct. 26, 2009, available at http://www.theaustralian.com.au/news/ scientologists-in-privilege-claim/story-e6frg 6oo-1225791165224 (explaining that Church of Scientology maintains "audit" file on parishioners that are "privileged and sacrosanct.... [They] are notations of a parishioner's spiritual progress," and reporting privilege claim sustained against coroner's demand for information).
The overarching lesson gleaned from this most cursory review is clear: applying a cleric-penitent privilege without mooring it to some core religious tenet that protects the cleric trivializes the privilege and, more importantly, the societal goals it is designed to protect. Yet, there is no room in the majority's iteration of its standard for the bedrock religious concerns that gave rise to the privilege in the first instance.
Therefore, a better, more sensible rule would temper the standard adopted by the majority so that proper weight is given to the logical and historical underpinnings of the cleric-penitent privilege. Thus, it should be made explicit that the party asserting the cleric-penitent privilege must bear the burden of going forward and of persuasion, and demonstrate that an objectively reasonable penitent would believe that the challenged communication was made in confidence, as acknowledged by recognized religious tenets, to a cleric in the cleric's professional character or role as a spiritual advisor. Plainly said, in order for the cleric-penitent privilege to make sense, the question of whether the communication was made "in confidence" must be informed and governed by the fundamental tenets and practices of the religious belief represented by the cleric and espoused by the penitent, the objective facts surrounding the communications, the identity and purpose of the initiator of the communications, and any exchanges between the cleric and the penitent directly relevant to their spiritual relationship after the communications for which the privilege has been claimed have concluded.
In its application, then, the rule should be quite simple. If a communication would not be deemed privileged by the relevant religious authorities, that is, by "the discipline or practice of the religious body to which the cleric belongs or of the religion which the cleric professes[,]" N.J.S.A. 2A:84A-23; N.J.R.E. 511, then it should not be deemed privileged by civil authorities. On the other hand, if the communication is one that would have been deemed privileged in the proper religious context and it is made to one satisfying the definition of a cleric, that is, "a priest, rabbi, minister or other person or practitioner authorized to perform similar functions of any religion[,]" N.J.S.A. 2A:84A-23; N.J.R.E. 511, then the privilege should apply. In the end, that plain rule does nothing more than acknowledge the New Testament's injunction, one that also finds expression in the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution, U.S. Const. amend. I, and paragraphs 3 and 4 of Article I of the New Jersey Constitution, N.J. Const. art. I, ¶¶ 3-4: "Render therefore to Caesar the things that are Caesar's, and to God the things that are God's." Matthew 22:21.
Because the majority eschews such common sense and historically laden interpretation *1143 of the privilege in favor of an antiseptic, purely secular formulation, I must dissent.

II.
Even if one were to agree that the majority's statement of the standard applicable for the invocation of the cleric-penitent privilege was correct, the majority's application of that standard in this case separately requires that I dissent for two reasons: the majority's failure to analyze whether its new standard constitutes a new rule of law, requiring a full-fledged analysis of its retroactive or prospective effect; and the brute force application of this new standard in this case, without allowing the parties to frame their proofs in conformity with the majority's new standard, denies the State even a modicum of the fairness required by due process.

A.
This Court has made clear that "a case announces a new rule when it breaks new ground or imposes a new obligation on the State or if the result was not dictated by precedent existing at the time the defendant's conviction became final." State v. Molina, 187 N.J. 531, 543, 902 A.2d 200 (2006) (quoting State v. Lark, 117 N.J. 331, 339, 567 A.2d 197 (1989) (internal quotation marks and editing marks omitted)); accord State v. Cummings, 184 N.J. 84, 97, 875 A.2d 906 (2005) (quoting State v. Knight, 145 N.J. 233, 250-51, 678 A.2d 642 (1996)).
When measured against that yardstick, the standard today announced by the majority cannot be anything other than a "new rule of law." Even the majority must concede that it has stated a new test; otherwise and in a very practical sense, there would have been no reason, in the first instance, for the Court to have developed the standard it now has. Given that conclusion, one must determine "whether the rule we announce today `is to be applied retroactively and, if so, to what extent, a determination that implicates a three-step analysis.'" Molina, supra, 187 N.J. at 542-43, 902 A.2d 200 (quoting Cummings, supra, 184 N.J. at 96-97, 875 A.2d 906). That "three-step analysis" consists of
(1) whether the rule at issue is a new rule of law for purposes of retroactivity analysis; (2) a balancing of the purpose of the new rule, the degree of reliance placed on the old rule, and the effect a retroactive application would have on the administration of justice; and (3) whether the rule is to be applied prospectively only, applied prospectively and in the case under consideration, given pipeline retroactivity, or given complete retroactivity.
[Id. at 543, 902 A.2d 200 (citations, internal quotation marks and editing marks omitted).]
Once it is determined that a new rule of law is to be applied,
four possible options are available:
(1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted.

*1144 [State v. Colbert, 190 N.J. 14, 22-23, 918 A.2d 14 (2007) (quoting State v. Burstein, 85 N.J. 394, 402-03, 427 A.2d 525 (1981).)]
Although the majority's new standard undoubtedly qualifies as a new rule of law, the required analysis of whether that new rule should be applied in this caseor in any other caseis noticeably absent. The majority does not address whether its new rule is one to which retroactivity analysis applies; the majority does not engage in the critical, necessary weighing analysis due between the old and new rule; and the majority does not determine what level of retroactivity or prospective application its new rule should have. Because the majority fails to discuss whether it has adopted a new rule or whether that rule should have retroactive or prospective effect, I must dissent.

B.
Finally, eschewing any form of new rule/retroactivity analysis, the majority simply applies its new rule to the facts as developed belowalbeit in respect of a different rule of lawand reaches its own conclusions. Even though it admits that "[i]t is unclear whether the trial court followed the ... approach" adopted by the majority, ante at 388, 990 A.2d at 1133, the majority nevertheless "conclude[s] that there is ample support in the record for the ... conclusion that the privilege applies." Ibid. Because that procedure artificially and needlessly forecloses the parties from the opportunity or ability to develop a proper record while cognizant and on notice of the controlling legal principles, I also must dissent.
It hardly need be said: a bedrock principle of due process is that parties must be on notice of what is to be litigated. McKesson Corp. v. Hackensack Med. Imaging, 197 N.J. 262, 275, 962 A.2d 1076 (2009) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490, 497 (1980)). See also Simmermon v. Dryvit Systems, Inc., 196 N.J. 316, 330, 953 A.2d 478 (2008) (explaining that "`minimum procedural requirements' [of due process] are `notice plus an opportunity to be heard and participate in the litigation'" (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628, 641-42 (1985)); Jamgochian v. New Jersey State Parole Bd., 196 N.J. 222, 240, 952 A.2d 1060 (2008) (stating that "`[t]he minimum requirements of due process ... are notice and the opportunity to be heard'" (quoting Doe v. Poritz, 142 N.J. 1, 106, 662 A.2d 367 (1995)).
The parties in this case, in contrast, have been denied that core element of due process. Given the result forcibly commanded by the majority, defendant should have little cause for complaint. The State, on the other hand, is in these very real respects a litigant like any other, and one that also is entitled to fairness, a leitmotif that pervades our jurisprudence. See, e.g., Pasqua v. Council, 186 N.J. 127, 142, 892 A.2d 663 (2006) (stating that due process "is nothing more than affording `fundamental fairness' to a litigant in a particular situation" (citing Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640, 648 (1981)); Oliver v. Ambrose, 152 N.J. 383, 403, 705 A.2d 742 (1998) (stating that judicial economy "cannot override ... overall objective of fairness to litigants"); Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 345, 643 A.2d 1 (1994) (requiring that "a court should consider the fairness to the litigant when the issues of damages and liability may be indivisible"); N.J. Election Law Enforcement Comm'n v. Citizens to Make Mayor-Council Gov't Work, 107 N.J. 380, 388, 526 A.2d 1069 (1987) (explaining *1145 that, "[i]n choosing between [retroactivity/prospective application] options, the court must weigh considerations of fairness to the litigants as well as the dictates of sound public policy"); Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 227, 294 A.2d 7 (1972) (stating class action rules "should be applied liberally ... if it is possible to do so with fairness to the litigants"); State v. McCann, 391 N.J.Super. 542, 553, 919 A.2d 136 (App.Div.2007) (stating that judicial disqualification implicates, among other concerns, fairness to litigants); Arenas v. Gari, 309 N.J.Super. 1, 19, 706 A.2d 736 (App.Div.1998) (holding that "jurors must not only be fair and impartial, they also must appear so, in order to maintain the litigants' confidence in the basic fairness of the trial"); Klajman v. Fair Lawn Estates, 292 N.J.Super. 54, 61, 678 A.2d 289 (App.Div.1996) (vacating dismissal of complaint because "[f]airness to the affected litigant requires no less").
In the end, there simply is no logical or jurisprudentially valid reason the majority, after stating its new standard, does not remand this case for a new hearing where, on a level and properly informed playing field, the litigants can make their best case and argue to the trial court based on clear legal principles. Anything less is trial by ambush, and nothing more than an unfair change in the rules after the match has been played.

III.
For the reasons presented, I would adopt a standard for the evaluation of cleric-penitent privilege claims that incorporates the relevant religious tenets in determining whether the conversation to be disclosed was in fact confidential and, therefore, worthy of the privilege. In any event, I also would remand this case to the trial court for the development of a record informed by the relevantand concededly newlegal principles today adopted. Because the majority does neither, I respectfully dissent.
For reversal and remandmentChief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN, WALLACE, and HOENS6.
For affirmanceJustice RIVERASOTO1.
NOTES
[1] Brown's testimony mixes what he said with his reasons for calling. For example, Brown testified, "I left a message that I wanted to talk to him because I didn't want him to go back and sleep into the house that night." In response to another question about what he relayed in his message, Brown said,

[t]hat I wanted to talk to him because I understand, you know, that something serious had happened so I wanted to talk to him and, like I said, I didn't want to expose these kids any longer to what I perceived as danger to them and so I wanted to talk to him to let him know he should leave the house immediately.
It is not possible, from a reading of the transcript, to separate what Brown said from his state of mind in placing the calls, and the trial judge made no findings in that regard.
[2] This Court has previously recognized that although confession is not a tenet of all religious traditions, many Protestant denominations, including the Episcopal Church, Evangelical Lutheran Church in America, Presbyterian Church (U.S.A.), and American Baptist Churches USA, adhere to the principle of confidentiality for communications between clerics and congregants. Szemple, supra, 135 N.J. at 424, 640 A.2d 817.
[3] The dissent finds support for its test in various law review articles. Post at 398-99, 990 A.2d at 1140. The articles, however, do not specifically address either N.J.S.A. 2A:84A-23 or N.J.R.E. 511. One theory endorsed by the dissent suggests a narrower privilege "to exclude those religions that do not require confidentiality and includ[e] only those that do." Horner, supra, at 729 (quoted in post at 399, 990 A.2d at 1140). After stating a hypothetical test, though, the author concedes that "[s]uch a limited statute, however, may remain unconstitutional in its effect by limiting the privilege to members of the Catholic Church and similar groups." Ibid. (citation omitted).
[4] The dissent maintains that today's decision establishes a new rule of law that should not be applied without first giving the parties a chance to develop a record with the test discussed in section IV in mind. But the test is not a new rule. It tracks the statute, uses Cary's three-part analysis, and employs an objective reasonableness standard consistent with prior case law. See, infra, at 403-05, 990 A.2d at 1143-44. In addition, the County Prosecutor and amicus Attorney General both recommended an objective reasonableness standard based on the totality of the circumstances  the test used in today's decision  and both framed their arguments around that test. Neither argues that the standard should be grounded on the fundamental tenets of a particular religious faith. Therefore, while the State may disagree with the test's application, it is not disadvantaged by seeing a standard that it has agreed with used in this case.
[1] Evidence Rule 37 addressed waivers of the privilege. See L. 1960, c. 53, § 29 (eff. Jun. 20, 1960), codified at N.J.S.A. 2A:84A-29, now codified at N.J.R.E. 530. See Table of Dispositions, Biunno, Current N.J. Rules of Evidence, 903 (2009). Other than adding that caveat and updating the list of those who qualify as "clergy" under the statute, the substance of the privilege remained unaffected.
[2] In re Murtha is poignantly instructive; it specifically disallowed the privilege for communications made to a Catholic nun, noting that she did not qualify under the statutory classifications of "clergyman, minister or other person or practitioner authorized to perform similar functions." Supra, 115 N.J.Super. at 386, 279 A.2d 889.
[3] In 1991, Evidence Rule 29 was re-codified as New Jersey Evidence Rule 511 as a result of the work of the New Jersey Supreme Court Committee on the Rules of Evidence, which was charged "to consider whether or to what extent New Jersey should adopt the Federal Rules of Evidence which are now followed by many states," Report of the New Jersey Supreme Court Committee on the Rules of Evidence, reprinted at Biunno, supra, at ix. See Table of Dispositions, id. at 903.
[4] The 1994 amendments to the cleric-penitent privileges also included a new provision defining who may waive the privilege. It now provides:

The privilege accorded to communications under this rule shall belong to both the cleric and the person or persons making the communication and shall be subject to waiver only under the following circumstances:
(1) both the person or persons making the communication and the cleric consent to the waiver of the privilege; or
(2) the privileged communication pertains to a future criminal act, in which case, the cleric alone may, but is not required to, waive the privilege.
[L. 1994, c. 123, § 1 (eff. Oct. 26, 1994), codified at N.J.S.A. 2A:84A-23 and N.J.R.E. 511.]
The effect of this addition was to overrule, in part, this Court's holding in Szemple that "the clergyperson is the only person who can waive the privilege." Supra, 135 N.J. at 429, 640 A.2d 817.