**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4975-17T3

IN THE MATTER OF THE
SUSPENSION OR REVOCATION
OF THE LICENSE OF
L. BARRY HELFMANN, PSY.D.

_____

Argued September 12, 2019 – Decided May 29, 2020

Before Judges Alvarez, Nugent and Suter.

On appeal from the New Jersey State Board of Psychological Examiners, Division of Consumer Affairs.

Scott B. Piekarsky argued the cause for appellant L. Barry Helfmann (Piekarsky & Associates, LLC, attorneys; Scott B. Piekarsky, of counsel and on the briefs; Jennifer O'Neill, on the briefs).

Joan D. Gelber, Senior Deputy Attorney General, argued the cause for respondent State Board of Psychological Examiners (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Joan D. Gelber, on the brief).

Lite DePalma Greenberg, LLC, attorneys for amici curiae American Group Psychotherapy Association and International Board for Certification of Group Psychotherapists (Bruce D. Greenberg and Michael R. Darby, on the brief).

PER CURIAM

The Attorney General brought this action under the Uniform Enforcement Act (UEA) governing professional and occupational boards, N.J.S.A. 45:1-14 to -27, seeking to have the license of appellant L. Barry Helfmann, Psy.D. suspended and have him pay a civil penalty for repeatedly providing confidential information concerning patients' diagnoses and treatment methods to collection attorneys he retained to collect patients' delinquent accounts. The Attorney General also sought attorney's fees and costs. The State Board of Psychological Examiners (the Board) suspended Dr. Helfmann's license, imposed a civil penalty, and assessed fees and costs.

Dr. Helfmann appeals. Because the Practicing Psychology Licensing Act (PPLA), N.J.S.A. 45:14B-1 to -48, and its implementing regulations require a psychologist to maintain—absent a statutory or other exception—the confidentiality of such patient information, and because there is no exception for the kind of information Dr. Helfmann provided to the collection attorneys, we affirm the Board's finding that Dr. Helfmann violated the PPLA. Because the sanctions the Board imposed are not so disproportionate to the violations as to be shocking to one's sense of fairness, and because the Board's assessment of attorney's fees was not an abuse of its discretion, we affirm the Board's decision in its entirety.

2

I.

A.

When the events chronicled in the record occurred, Dr. Helfmann was a treating psychologist and the managing partner of his practice group (the "Partnership"). Following a formal inquiry by the Board into the doctor's disclosure of confidential information to the Partnership's collection attorneys, the Attorney General filed an administrative complaint. The complaint alleged Dr. Helfmann, in his roles as psychologist and managing partner, violated the PPLA and its implementing regulations.

The complaint included five counts. It alleged Dr. Helfmann failed to do the following: take reasonable measures to protect confidentiality of the Partnership's patients' private health information; maintain permanent records that accurately reflected patient contact for treatment purposes; maintain records of professional quality; timely release records requested by a patient; and properly instruct and supervise temporary staff concerning patient confidentiality and record maintenance. The Attorney General sought sanctions under the UEA.

Following the filing of the administrative complaint, Dr. Helfmann engaged in intensive motion practice and filed a Superior Court action in an effort to have the administrative proceedings dismissed. The motions he filed in the Office of

Administrative Law ("OAL") included a challenge to the Board's authority to subpoena the doctor's corporate records, a motion to disqualify the Senior Deputy Attorney General who was charged with prosecuting the complaint, a motion to disqualify the Attorney General's expert, and a motion to preclude the testimony of one of the doctor's former patients. The doctor also served subpoenas on the Board's Executive Director and all Board members, so the Attorney General had to file a motion to quash subpoenas the doctor served. Dr. Helfmann's Superior Court action was dismissed with prejudice. On appeal, we affirmed the trial court's order of dismissal. Helfmann v. State Bd. of Psychological Exam'rs, No. A-1049-18 (App. Div. Dec. 6, 2018).

Based on proofs the parties presented at a hearing in the OAL, an Administrative Law Judge ("ALJ") found the Attorney General had sustained the burden of proof on two of the complaint's five counts: count one, concerning protecting patient privacy, and count two, concerning record-keeping. The parties filed exceptions. The Board adopted the ALJ's findings of fact and legal conclusions but imposed more severe sanctions than those recommended in the ALJ's initial decision. The Board suspended Dr. Helfmann's license for two years, barred him from practicing during the first year, but stayed the second one-year suspension, allowing him to resume practice on probation, with conditions. The Board also

imposed a $10,000 civil penalty. It deferred its decision on the amount of costs and fees. Thereafter, the Board ordered Dr. Helfmann to pay costs and fees totaling $110,542.08.

Dr. Helfmann appealed. His applications to the Board, this court, and the Supreme Court for a stay pending appeal were denied.

B.

During the hearing in the OAL, Dr. Helfmann testified. In addition, the Attorney General presented the testimony of one of Dr. Helfmann's former patients and an expert. Dr. Helfmann presented the testimony of an administrative assistant employed by the Partnership and an expert. Dr. Helfmann also introduced letters from numerous colleagues and professional acquaintances attesting to his distinguished career, professionalism, ethics, and personal integrity, attributes later confirmed by witnesses who testified during a penalty hearing before the Board. We need not recount the evidence the Attorney General presented during the hearing in the OAL on the complaint's counts other than the first concerning confidentiality, because three of the five charges in the administrative complaint were dismissed and Dr. Helfmann represented to the Board, "we have no objection to sustaining the recordkeeping violation."

A-4975-17T3

The proofs that Dr. Helfmann provided confidential patient information to the Partnership's collection attorneys were undisputed. The information included codes for the patients' diagnoses, readily decoded through internet sources, and either codes for the treatment provided or identification of the actual treatment. There was no dispute this information was confidential, nor was there a dispute the Partnership so advised its patients.

When new patients consulted the Partnership, they were required to sign numerous documents, including documents containing representations the Partnership would protect patient confidentiality. For example, the former patient testified he signed a form entitled "Terms and Conditions of Treatment," which included this paragraph:

> Confidentiality: You have the right to privacy and confidentiality with your clinician. We abide by legal and ethical standards to maintain your confidentiality. Exceptions to this standard of privacy occur in the case of imminent risk or danger to oneself or others, child abuse or in the case of court order. Please discuss this matter further with your clinician.

Although the Partnership was not subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. §1320, the Partnership required new patients to sign a form entitled "Notice of Privacy of Individually Identifiable Health Information," which informed the patients in part:

6

> The federal government mandated that as of April 14, 2003 all health care patients are to receive from their clinicians a notice (hereafter referred to as "Notice") regarding the protection of their private health care information in compliance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule (45 C.F.R. parts 160 and 164).
>
> This acknowledgment documents that [Dr. Helfmann] has given you the "Notice" that is required. HIPAA covers what is called "protected health information" (PHI) that is used for treatment, payment and health care operations. PHI is information in your health record that could identify you.

The forms new patients received also represented the Partnership "must make reasonable efforts to limit the disclosure to the minimum information necessary to accomplish the purpose of the use, disclosure or request."

If a patient's bill was delinquent and the Partnership decided to send the bill to its collection attorneys, the Partnership was able to provide the attorney with either of two forms: a transaction ledger or a true bill. The transaction ledger included only the patient's name, date of service, amount charged, and the "billable party." In contrast, a true bill included the same information plus CPT and DSM codes. CPT or "Current Procedural Terminology" codes referenced the treatment provided and often followed the identified treatment, "psychotherapy." DSM or "Diagnostic and Statistical Manual of Mental Disorders" codes referred to the patient's psychological disturbance. A DSM code was a diagnosis.

A-4975-17T3

The Partnership's billing manager provided the Partnership's collection attorneys with the true bill rather than the transaction ledger. When the attorneys filed the collection complaint, they attached a copy of the true bill containing the CPT and DSM codes.

Dr. Helfmann's former patient testified that when he learned the Partnership's collection attorney had attached a true bill to the complaint, he filed a counterclaim. Dr. Helfmann refused to instruct his attorney to replace the true bill attached to the complaint with a transaction ledger, so the patient retained an attorney, who filed a motion to compel substitution of a transaction ledger for a true bill. The trial court granted the motion, first as to the complaint filed by the collection attorney against the former patient, and thereafter as to all such complaints electronically or physically filed by the collection attorney.

More than eighty complaints requiring substitution or redaction were identified during the hearing. Twenty-two such complaints were admitted into evidence. The complaints were not restricted to adult patients but included children as well, so the confidential information concerning the children was disclosed, even though they were not the parties responsible for paying the Partnership's bills.

Dr. Helfmann did not dispute the DSM and CPT codes were confidential, or that the Partnership provided true bills to its collection attorneys, or that the attorneys

A-4975-17T3

attached true bills to collection complaints filed in Superior Court. Rather, Dr. Helfmann testified that he relied on legal advice about what information collection attorneys required from the Partnership. He denied any knowledge that the attorneys were attaching true bills to the complaints they filed. He said that when his former patient asked him to remove or redact the true bills, he told the collection attorney to do so, but the collection attorney refused unless the patient withdrew his counterclaim. According to Dr. Helfmann, the collection attorney said he was acting on the advice of his malpractice attorney.

The doctor explained that approximately twenty-five years ago, he hired the collection law firm the Partnership still uses. When the doctor initially spoke to one of the collection firm's principals, the principal said the law firm needed a copy of the exact bill the patient received. The principal explained the law firm would discuss the bills with the Partnership's patients and hopefully come to a resolution. If the law firm had to file a lawsuit, it would provide the patient information, the amount owed, and the contact information of the patient.

Dr. Helfmann insisted that neither he nor anyone in the Partnership knew the collection attorneys were attaching true bills to their collection complaints. The only document the doctor could recall receiving from the attorneys when a suit was filed was an affidavit of non-military service. He denied ever receiving a copy of a filed

complaint. According to Dr. Helfmann, no one in the Partnership would have allowed the collection attorneys to attach true bills to the complaints they filed.

During the intervening years, Dr. Helfmann asked a principal of the law firm why the firm continued to need a true copy of a patient's bill. The law firm's principal explained that when the law firm contacted the patient, the first thing the patient wanted to do was see the bill, even though Dr. Helfmann and the Partnership had sent the patient monthly bills. The collection firm's principal said patients would insist on seeing the bill so they could either dispute it or agree with it.

Dr. Helfmann testified that in 2013 he wanted to make sure the Partnership was in compliance with new HIPAA regulations. He had his billing manager contact a lawyer in the collection firm and discuss the matter with the lawyer.

The Partnership's billing manager, who was the primary liaison between the Partnership and the collection law firm, testified that in 2013 she contacted an attorney at the law firm and asked for clarification on terminology such as summonses, complaints, and judgments. She had a lengthy discussion with the attorney about those items. In addition, she asked him about the documents that the Partnership sent to him. She said he told her, "we had attorney/client privilege and that everything I sent to him was fine." She explained she was sending him a true

bill for each patient turned over for collection. She repeated that the attorney told her that everything she sent to him was privileged.

During the hearing in the OAL, the parties stipulated to the admission of the deposition transcript of one of the collection attorneys. The attorney testified, "[i]n the past, what we've requested from the clients, including [the Partnership,] is a statement of account showing the balance due so we know how much to collect." In his experience, the statements of account included DSM codes. The attorney testified DSM codes were not important to his collection efforts. The codes had nothing to do with the amount of money the patient owed to the Partnership, nor did the nature of the treatment the patient received have anything to do with the amount of money that was owed by the patient.

According to the attorney, the billing information important to him included the dates of service, the fact that service was rendered, the dollar amount for each service rendered, and the total amount outstanding. The only time the collection attorney would have required a medical chart would be if a demand for the chart was made during discovery in the collection action. The attorney repeated that CPT and DSM codes "had no application to what we needed."

Each party presented testimony from an expert. The attorney general presented the testimony of Victoria Jeffers, Ph.D., who was qualified as an expert in

psychology. Dr. Jeffers opined that when Dr. Helfmann released the confidential patient information to the collection attorneys it was "a serious breach of ethics and the law, and that, quite frankly, that was the major concern." Dr. Jeffers testified that Dr. Helfmann should have been aware of what his billing manager was providing to the debt collection attorneys and what the debt collection attorneys were filing with the court. According to Dr. Jeffers, Dr. Helfmann should have been receiving copies of the complaints.

Dr. Jeffers explained that Dr. Helfmann's major failure was not protecting his patients' confidential information. She criticized Dr. Helfmann for, in effect, providing to the billing manager patient data that was sent to the collection attorneys. In Dr. Jeffers' opinion, the billing manager "didn't apparently know that she was releasing confidential information so she wasn't trained."

Dr. Helfmann's expert, William Boyce Lum, Psy.D., also an expert in psychology, disagreed with Dr. Jeffers. Based on his education, training, experience, and review of relevant materials, Dr. Lum opined Dr. Helfmann complied with accepted standards concerning confidentiality of patient health information and documents released to a collection law firm. In Dr. Lum's opinion, the Partnership followed the American Psychological Association's (APA) suggested formula concerning "such a matter."

A-4975-17T3

Dr. Lum relied in large part on a letter he reviewed. The letter was written by the Senior Special Counsel, Legal and Regulatory Affairs of the APA. Dr. Lum quoted a sentence that said the APA "[g]enerally recommend[s] that the member psychologist rely on the advice of counsel in their state with appropriate experience." Dr. Lum pointed out the legal issues were complex, especially concerning the appropriate information to disclose in a collection matter against a patient. Dr. Lum further characterized the letter as stating the APA's position, "they don't expect a non-lawyer psychologist to be able to perform this analysis." Nor did the APA, according to Dr. Lum, expect a psychologist to oversee an attorney's filings.

The letter noted, "[t]he issue of collection counsel including more than minimum necessary information in filings for a collection action had not been 'on our radar' prior to the Incident (but we will alert members to this issue going forward)." The letter also noted that the APA's latest article discussing collection actions mentioned "the risk of triggering a board complaint, but does not warn members to check what patient information their attorneys may file in a collection action." The letter's author continued, "nor have I warned members about to oversee lawyer's court filings in numerous individual consultations on collecting unpaid fees from patients." Dr. Lum concluded Dr. Helfmann had violated no regulatory or ethical standards concerning disclosure of confidential patient information.

## C.

In her comprehensive opinion, the ALJ noted Dr. Helfmann's acknowledgment that a diagnostic code is confidential information and should not be in the public domain. Citing statutory and regulatory authority, the ALJ found licensed psychologists are subject to a statutorily imposed duty of confidentiality and are limited by regulations "to whom, how, and when a patient record shall be released by the licensee." Yet, "[d]uring the twenty-five years during which [Dr. Helfmann] sent patients to collection, he never discussed with the firm whether the patient's confidential information was being included in the complaint. In addition, he never discussed confidentiality of records with the [collection] law firm."

The ALJ found Dr. Helfmann did not review with his staff "whether the office should provide to the attorney only the transaction ledger rather than the true bill, and had not considered whether any personal health information should be redacted before referral to collections." Significantly, the ALJ determined that over the years and into 2014, "eighty-one complaints were filed in Superior Court on behalf of respondent and other practitioners of the [Partnership]. These complaints attached the true bill, which became public record."

14

Last, the ALJ found Dr. Helfmann "never saw a copy of the collection complaint that was filed with the court. The only document he saw was the Affidavit of Non-Military Service that had to be signed by the doctor." The ALJ noted that the deposed collection attorney, who was an associate at the law firm retained by the Partnership, testified that when his firm was asked to do a collection case, they requested a statement of account showing the balance due so they would know how much to collect. The ALJ further noted the attorney's testimony that the DSM diagnosis codes and CPT codes "had no application to what we needed"; all that was needed for filing were "dates of service, the fact that service was rendered, the dollar amount for each one and the total."

The ALJ concluded Dr. Helfmann did not take reasonable measures to protect the confidentiality of patients' protected health information, but he had "no intention to directly flaunt the rules or harm the patient." She also concluded he intentionally failed to prepare and maintain a permanent patient record which accurately reflected [the former patient's] contact for treatment purposes. She dismissed the remaining charges.

The ALJ imposed a $10,000 civil penalty. She imposed "no further license sanction." Concerning costs, the ALJ determined the doctor "should be responsible for the payment of expert fees which were related to the issues of confidentiality and

15

the failure to take notes, and the costs of OAL transcripts[,]" as well as "the cost of Board and OAL transcripts, which were necessitated by the investigation and prosecuting of this action." In view of her finding that Dr. Helfmann neither directly flaunted confidentiality rules nor harmed any patient, and considering the Attorney General proved only two of five charges, the ALJ awarded only two-fifths of the fees sought by the Attorney General.

D.

The Board adopted the ALJ's findings of fact and conclusions of law. It "consider[ed] the violations that Dr. Helfmann was found to have committed in this case to be serious violations of professional ethics and of the law governing the practice of psychology in New Jersey which amply support, if not dictate, a suspension of licensure." The Board also found that by providing true bills containing DSM and CPT codes to the Partnership's collection attorneys, including many cases involving the treatment of children, the doctor committed "a fundamental breach of the responsibilities incumbent on him as a licensed psychologist to preserve the sanctity of psychologist-patient relationship and to preserve the confidentiality integral to that relationship." The Board added that Dr. Helfmann "eschewed his core ethical responsibilities when he provided his collection attorneys with sensitive patient information, without engaging in any 'due

diligence' to ensure that such information was not released to the public, and without engaging in any real effort to determine whether the information was 'necessary' to provide to the attorneys."

The Board emphasized the duty to maintain confidentiality was the doctor's duty, not that of his attorneys: "Most significantly, the responsibility to maintain the information concerning diagnoses and treatment was Dr. Helfmann's alone as a licensed psychologist; Dr. Helfmann's breach of his ethical obligations thus occurred when the 'true bills' were provided to the attorneys, not when the attorneys publicly disseminated that information by attaching copies of the 'true bills' to [c]omplaints filed in the Superior Court in collection actions." In the Board's view, Dr. Helfmann "shattered the trust of his patients by providing their most sensitive information to third parties[,]" and his "failure to preserve patient confidentiality strikes at the very core of his ethical obligations as a psychologist, and his actions bespeak the fundamental abrogation of his core responsibility as a licensee."

The Board noted that Dr. Helfmann's failure to maintain adequate patient records provided an independent basis for disciplinary sanction that, though arguably not as egregious as his failure to preserve confidential information, further supported the suspension of his license.

 A-4975-17T3

Concerning sanctions, the Board stated: "Simply put, we find the violations which Dr. Helfmann committed in this case are violations which necessarily compromised the privacy and confidentiality interests of each and every patient whose 'true bill' was provided to his collection attorneys." The Board rejected the ALJ's suggestion that the absence of any intent by Dr. Helfmann to directly flaunt ethics rules or harm the public militated against a disciplinary sanction. The Board explained, "[t]he preservation of a patient's confidentiality interests is a core non-delegable responsibility of each and every licensee." Citing N.J.A.C. 13:42-8.5, requiring a psychologist to preserve the confidentiality of information obtained from a patient, the Board stressed that "[a] licensee must recognize that confidential information disclosed by a patient during a treatment session is to remain strictly confidential, absent risk of imminent harm to the patient or others, possible child abuse or Court Order."

The Board also explained that a patient's diagnosis and the method by which a patient is treated is "among the most sensitive of information entrusted to a licensed psychologist. The Board concluded, "Dr. Helfmann's failure, as the managing partner of his group, to have taken adequate measures to prevent the unnecessary disclosure of sensitive and confidential information violated his fundamental ethical obligations to his patient specifically and to the profession as a whole."

18

Consequently, whether the doctor's "actions were or were not intentional is simply not a relevant factor in assessing discipline."

Similarly, the Board rejected Dr. Helfmann's argument he should be "exonerated from responsibility because the patient information was provided to an attorney, or because he didn't intend to harm any patients[.]" The Board reiterated,

> [a]s a licensed psychologist, Dr. Helfmann has a legal, ethical, and moral duty to protect the confidentiality of his client's mental health information. He violated his professional obligations, and the requirements of both Board regulations and of the Uniform Enforcement Act, when he repeatedly disclosed that information and his violation of professional norms was flagrant and egregious.

In a footnote, the Board explained:

> [The] ALJ . . . found, and we concur, that Dr. Helfmann failed to use "due diligence in being sure that confidential information was not released and his patients were protected." She then proceeded to point out a litany of steps that Dr. Helfmann could have taken, but did not, to seek to preserve the confidentiality of information on the "true bills," to include seeking to explain to his attorney that the information must be considered to be confidential and that he was duty bound to protect that confidentiality; having discussions with the collection attorney as to the confidential nature of the information on the true bill; or asking to receive copies of any complaints filed in collection matters against his former patients.
>
> Our conclusions on penalty might well have been in line with [the] ALJ['s] had Dr. Helfmann in fact taken any of the suggested actions to preserve the confidentiality of

19

A-4975-17T3

the information he disclosed to his attorneys. His failure to take those actions, however, militates against adopting the ALJ's recommendations that he should not receive any disciplinary sanction.

The Board characterized Dr. Helfmann's breach of confidentiality as "being clearly among the most egregious infractions a licensed psychologist can commit." Reiterating that Dr. Helfmann, "as a licensed psychologist has a legal duty to protect patient confidentiality[,]" and "[t]he duty cannot be waived or transferred merely because a psychologist retains an attorney to resolve collection matters[,]" the Board was emphatic that "[c]onfidentiality is the cornerstone for building trust between a patient and his psychologist, and Dr. Helfmann's failure to have maintained that confidentiality constituted a fundamental abrogation of his professional responsibilities."

The Board imposed the sanctions we have noted and this appeal followed.

II.

On appeal, Dr. Helfmann argues three points. First, he argues that justice requires a reversal or the imposition of lesser penalties because the penalties the Board imposed were so disproportionate to the alleged offense and unsupported by law as to be shocking to one's sense of fairness. Next, Dr. Helfmann argues there is no legal basis for the alleged confidentiality violations, that is, he did not violate any identifiable rule or regulation when he provided his collection attorneys with

specifically requested patient information. Last, Dr. Helfmann argues that the charge concerning record-keeping is a mere technical violation that does not warrant a license suspension, as evidenced by the Board's decisions in other cases involving such charges.

Amici curiae, American Group Psychotherapy Association and International Board for Certification of Group Psychotherapists, argue that providing personal health information to a collection attorney does not violate a psychologist's duties concerning patient privacy, because the psychologist and attorney are in a common interest and principal-agent relationship. Amici contend the Board improperly imposed a non-delegable duty of confidentiality on Dr. Helfmann to make him responsible for the improper and unforeseen action of collection attorneys.

The Attorney General responds that Dr. Helfmann's failure to comply with his professional responsibilities as a licensed psychologist is supported by overwhelming evidence in the record and consistent with applicable law. The Attorney General also argues the discipline imposed by the Board is fully supported by the record. The Attorney General submits that under an appellate court's limited standard of review of an agency's disciplinary sanction, there is no basis to disturb the Board's decision, because the sanction is not so disproportionate to the offense as to be shocking to one's sense of fairness.

21

Dr. Helfmann replies that the Board's legal conclusions and credibility determinations are not entitled to deference by an appellate court. He adds that if this court upholds the Board's determination that he violated the PPLA, then the penalties imposed by the ALJ, not the Board, should be enforced, because the Board's sanctions are arbitrary and disproportionate to the violations.

III.

A.

Our review of agency determinations is limited. In re Stallworth, 208 N.J. 182, 194 (2011). We accord a "strong presumption of reasonableness" to the agency's exercise of its statutorily delegated responsibilities. City of Newark v. Nat. Res. Council, 82 N.J. 530, 539 (1980).

When reviewing findings of fact, we must determine whether such findings could reasonably have been reached on "sufficient" credible evidence present in the record considering the proofs as a whole, giving "due regard" to the ability of the factfinder to judge credibility. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). We also generally "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "Where . . . the determination is founded upon

22

sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba v. Bd. of Trs. Pub. Emps.' Ret. Sys., 83 N.J. 174, 189 (1980) (citing Close, 44 N.J. at 599).

For these reasons, we ordinarily will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." Virtua-West Jersey Hosp., 194 N.J. at 422. "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006). Although an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973), if substantial evidence supports the agency's decision, "a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992).

B.

The threshold issue we must decide is whether the Board wrongly concluded Dr. Helfmann breached his responsibilities to preserve the sanctity of the psychologist-patient relationship and to preserve the confidentiality integral to that relationship when he gave the collection attorneys true bills. We agree with the Board that he did, and that the breach occurred when the true bills were provided, not when the attorneys attached copies of the true bills to complaints they filed in the Superior Court. The Superior Court filings exacerbated the breach that had already occurred. By providing the attorneys true bills with diagnostic and treatment codes, Dr. Helfmann overlooked the psychologist-patient privilege, regulations implementing the PPLA, and his contractual commitments to his patients.

In a determination adopted by the Board, the ALJ found the PPLA, specifically N.J.S.A. 45:14B-28 entitled "Confidential Relations and Communications," imposed a duty of confidentiality on licensed psychologists. The statute, also found in the New Jersey Rules of Evidence, Rule 505, entitled Psychologist[-Patient] Privilege, provides in pertinent part:

> The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as

those provided between attorney and patient, and nothing in this act shall be construed to require any such privileged communications to be disclosed by any such person.

The Supreme Court has noted the policy underlying the psychologist-patient privilege is in some respects even more compelling than that of the attorney-client privilege:

> Courts should be mindful that, although New Jersey's psychologist-patient privilege is modeled on the attorney-client privilege, the public policy behind the psychologist-patient privilege is in some respects even more compelling. Like the attorney-client privilege, the psychologist-patient privilege serves the functional purpose of enabling a relationship that ultimately redounds to the good of all parties and the public. The psychologist-patient privilege further serves to protect an individual's privacy interest in communications that will frequently be even more personal, potentially embarrassing, and more often readily misconstrued than those between attorney and patient.
>
> [Kinsella v. Kinsella, 150 N.J. 276, 329-30 (1997).]

The psychologist-patient privilege protects both communications and the fact that a confidential relationship exists. See State v. J.G., 201 N.J. 369, 380 (2010) (explaining that "[t]he 1981 revision [to the priest-penitent privilege] paralleled the

psychologist-patient privilege in one other way: it protected both communications and the fact that a confidential relationship existed between a cleric and a penitent.")[1]

Dr. Helfmann does not dispute, as a general matter, that confidential relations protected by the psychologist-patient privilege include both a psychologist's diagnosis based on communications with a patient and the methods implemented to treat the diagnosed condition. As the ALJ noted, the doctor acknowledged that such information was confidential.

Significantly, the psychologist-patient privilege "belongs to the patient and any waiver of the privilege must be made by the patient." State v. Snell, 314 N.J. Super. 331, 337 (App. Div. 1998) (quoting State v. L.J.P., 270 N.J. Super. 429, 438 (App. Div. 1994)). Thus, a psychologist is prohibited from disclosing confidential information where no statutory or other traditional exception permits such disclosure. Cf. Kinsella, 150 N.J. at 306 ("Where no statutory or other traditional exceptions to the privilege apply, the court should not order disclosure of therapy records, even for in camera review by the court, without a prima facie showing that the psychologist-patient privilege should be pierced under [the] tripartite test [found in In re Kozlov, 79 N.J. 232, 243-44

---

[1]  The cleric-penitent privilege has since been amended. It now applies to a "communication made in confidence to a cleric," and no longer applies to the relationship itself. N.J.S.A. 2A:84A-23; N.J.R.E. 511.

(1979)]"). Providing confidential information to a collection attorney does not fall within a statutory or other traditional exception to the privilege.

The regulations implementing the PPLA include a regulation concerning confidentiality. The regulation, N.J.A.C. 13:42-8.5, provides in pertinent part:

> (a) A licensee shall preserve the confidentiality of information obtained from a client in the course of the licensee's teaching, practice or investigation. However, the licensee shall reveal the information to appropriate professional workers, public authorities and the threatened individual(s) or their representatives only, if in the licensee's judgment, exercised in accordance with the standards of the profession, any one of the following circumstances occur:
>
> > 1. There is a clear and imminent danger to the individual or the public;
> >
> > 2. There is probable cause to believe that an identifiable potential victim of a client is likely to be in danger; or
> >
> > 3. Release of such information is otherwise mandated by law, such as, but not limited to, N.J.S.A. 2A:62A-17.
> >
> > . . . .
>
> (g) A licensee may release confidential documents, testimony or other information contained in the client record only in accordance with the provisions of N.J.A.C. 13:42-8.3 and this section.

A-4975-17T3

The reference in subsection (g) to N.J.A.C. 13:42-8.3 concerns the release by a psychologist of confidential patient information upon request of a patient's authorized representative.

In addition to the statutory and regulatory prohibitions against disclosing confidential patient information, Dr. Helfmann and the Partnership gave written representations to their patients concerning confidentiality. As previously noted, they assured their patients that exceptions to the standard of privacy occurred in cases of imminent risk or danger to one's self or others, child abuse, or in the case of a court order. Further, patients were assured that the Partnership would "make reasonable efforts to limit the disclosure to the minimum information necessary to accomplish the purpose of the use, disclosure or request." Dr. Helfmann contravened these representations when he sent confidential information to the Partnership's collection attorneys.

Dr. Helfmann's argument that there is no factual or legal basis for the alleged confidentiality violations is devoid of merit and appears to be based on a fundamental misunderstanding of the statutory and regulatory schemes prohibiting disclosure of confidential information. The legal basis is found in the foregoing statutory and regulatory prohibitions against disclosing confidential information. The factual basis is Dr. Helfmann's disregard of those prohibitions.

28

The doctor's misapprehension is demonstrated by his argument that "[n]othing in the relevant state regulations guide a practitioner as to what information can be given to an attorney in a collection case." The applicable regulations could not be clearer; disclosure of confidential information is prohibited unless it falls within an exception. The regulation concerning confidentiality, N.J.A.C. 13:42-8.5, states plainly and clearly, "[a] licensee may release confidential documents, testimony or other information contained in the client record <u>only in accordance with the provisions of N.J.A.C. 13:42-8.3 and this section</u>." N.J.A.C. 13:42-8.5(g) (emphasis added). Nothing in this regulation or N.J.A.C. 13:42-8.3 authorizes the release of confidential information such as diagnoses and treatment methods to a collection attorney. As we have now noted several times, Dr. Helfmann does not dispute that such information is confidential.

Dr. Helfmann asserts that N.J.A.C. 13:42-8.3 is unclear and could lead a practitioner to consider his own attorney as an "authorized representative" for purposes of providing information for claim payment and debt collection. We decline to engage in a contorted construction of the regulation to reach that result. The regulation provides:

> (a) For purposes of this section, "authorized representative" means, but is not necessarily limited to, a person designated by the patient or a court to exercise rights under this section. An authorized representative

may be patient's attorney or an agent of a third party payor with whom the patient has a contract which provides that the third party payor be given access to records to assess a claim for monetary damages or reimbursement.

(b) A licensee may require the record request to be in writing. No later than 30 days from receipt of a request from a patient or duly authorized representative, the licensee shall provide a copy of the patient record and/or billing records, including reports relating to the patient. Limitations on this requirement are set forth in (e) below and N.J.A.C. 13:42-8.6(b) and in N.J.A.C. 13:42-11.

(c) The licensee may elect to provide a summary of the record, as long as the summary adequately reflects the patient's history and treatment, unless otherwise required by law.

(d) A licensee may charge a reasonable fee for the preparation of a summary and reproduction of records, which shall be no greater than an amount reasonably calculated to recoup the costs of transcription or copying.

(e) A licensee may withhold information contained in the patient record from a patient or the patient's guardian if, in the reasonable exercise of his or her professional judgment, the licensee believes release of such information would adversely affect the patient's health or welfare.

1. That record or the summary, with an accompanying explanation of the reasons for the original refusal, shall nevertheless be provided upon request of and directly to:

30

i. The patient's attorney;

ii. Another licensed health care professional; or

iii. The patient's health insurance carrier (except as may be limited by N.J.A.C. 13:42-11).

(f) Records maintained as confidential pursuant to N.J.A.C. 13:42-8.1(c) shall be released:

1. If requested or subpoenaed by the Board or the Office of the Attorney General in the course of any Board investigation;

2. Pursuant to an order of a court of competent jurisdiction;

3. Except as limited by N.J.A.C. 13:42-8.4, upon a waiver of the patient or an authorized representative to release the patient record to any person or entity, including to the Violent Crimes Compensation Board; or

4. In order to contribute appropriate patient information to the patient record maintained by a hospital, nursing home or similar licensed institution which is providing or has been asked to provide treatment to the patient.

(g) The licensee's obligation hereunder to release information shall include the obligation to complete forms or reports required for third party reimbursement of patient treatment expenses. The licensee may charge reasonable fees for completion of reports other than

31

health insurance claim forms, for which no fee may be charged pursuant to N.J.S.A. 45:1-12.

(h) When a request is made for release of already completed reports to enable the patient to receive ongoing care by another practitioner, the licensee shall not require prior payment for the professional services to which such reports relate as a condition for making such reports available. A licensee may, however, require advance payment for a report prepared for services as an expert witness.

"We interpret a regulation in the same manner that we would interpret a statute." US Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012). "Whether construing a statute or a regulation, it is not our function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'" Ibid. (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "We cannot rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." Ibid.

The regulation is clear. The doctor's argument to the contrary, that a psychologist could somehow confuse his collection attorney with a patient's authorized representative, is refuted by the regulation's plain language as well as consideration of its entire context. The doctor's argument is without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

We find nothing arbitrary about the Board's rejection of Dr. Helfmann's argument that he violated no rule or regulation because he relied on the advice of counsel in providing the Partnership's collection attorney with patients' confidential information. His assertion is contrary to the sworn testimony of the collection attorney who was deposed, as distinguished from another collection attorney with whom the doctor spoke in the distant past. The latter attorney's purported statement that confidential information might be necessary to resolve a patient's outstanding fee does not consider, let alone resolve, the propriety of a psychologist releasing such information in the face of clear statutory and regulatory prohibitions.

The Board found that Dr. Helfmann, not his collection attorneys, was charged with the professional responsibility of preserving his patients' confidential information. Perhaps the doctor's argument that he relied on the advice of counsel would have had greater appeal had he asked for a legal opinion on providing confidential patient information to collection attorneys in view of the psychologist-patient privilege and a specific regulatory prohibition against doing so absent a statutory or traditional exception. That the Board found unpersuasive Dr. Helfmann's hearsay testimony about what attorneys told him years ago is hardly arbitrary and capricious, considering the Partnership's current collection attorney's

33

testimony and Dr. Helfmann's statutory and regulatory obligations to preserve confidentiality.

We also find unpersuasive the arguments of amici. Like Dr. Helfmann, their point of departure is "[n]o statute, regulation, or case precludes a psychologist who wishes to file a collection complaint against a patient from providing to the psychologist's attorney complete information about the psychologist-patient relationship, including personal health information[.]" The issue is not whether disclosing confidential diagnoses and treatment information to collection attorneys is explicitly precluded by a statute, regulation, or case. Rather, the inquiry is whether given the broad statutory and regulatory duties to keep such confidential patient information confidential, disclosing such information to collection attorneys falls within a statutory, regulatory, or traditional exception. No such exception exists under current New Jersey law, regardless of any principal-agency relationship between the psychologist and a collection attorney.

Likewise, we find unpersuasive amici's argument that a psychologist's duty to safeguard a patient's confidential patient records is a tort duty which cannot be deemed non-delegable. Here, Dr. Helfmann's obligation arises under the PPLA and its implementing regulations. Even if the duty to maintain confidentiality may provide a standard of care, deviation from which may give rise to a professional

34

negligence action—an issue we need not and do not address—the duty is not merely a "tort duty" as amici suggest. We thus reject the argument that the Board's authority to impose sanctions for violation of its regulations is circumscribed by principles of tort law, including tort principles pertaining to the concept of non-delegable duty.

Citing HIPAA, amici argue that "statutory law contemplates disclosure of medical records to facilitate payment." Even under HIPAA regulations, however, Dr. Helfmann would have been obligated to obtain satisfactory assurance the attorneys would appropriately safeguard the confidential information. See 45 C.F.R. § 164.502(e)(1). In addition, he would have been permitted to release information only "to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request." 45 C.F.R. § 164.502(b)(1). As made clear by Dr. Helfmann's deposed collection attorney, the attorney did not need diagnostic and treatment information to pursue collection of patients' delinquent accounts.

We add that the record before us does not suggest anyone seriously contends a psychologist cannot provide a collection attorney with the minimum information needed to support a collection action. We have previously noted that HIPAA authorizes but carefully circumscribes collection activity. We also note that confidential relations and communications between practicing psychologists and patients "are placed on the same basis as those provided between attorney and

client." N.J.S.A. 45:14B-28; N.J.R.E. 505. The Rules of Professional Conduct authorize an attorney to reveal information relating to representation of a client "to the extent the lawyer reasonably believes necessary . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client," RPC 1.6(d)(2), language not entirely dissimilar to HIPAA's "minimum necessary to accomplish the intended purpose of the use, disclosure, or request" language in 45 C.F.R. § 164.502(b)(1). Here, no one contends disclosure of diagnostic and treatment information was necessary to pursue a collection action.

Last, we address the concern expressed by amici that the Board's decision would expose psychologists to liability for sharing information with their attorneys at the request of counsel, and for the independent action of attorneys who fail to keep health information confidential. We are not persuaded by such concerns.

Our holding is narrowly circumscribed. It is based on Dr. Helfmann's disclosure of CPT and DSM codes that were irrelevant to the elements of a collection action. Dr. Helfmann disclosed the information without consideration of the broad statutory and regulatory prohibitions against releasing confidential patient information, and without so much as discussing the statutory and regulatory prohibitions with his collection attorneys or asking them to specifically address the issue. Dr. Helfmann referenced HIPAA's confidentiality requirements in forms he

required patients to sign but overlooked the HIPAA regulations and the representations to his patients when he provided information concerning patients' diagnoses and treatment to the Partnership's collection attorneys. For twenty-five or more years, Dr. Helfmann never asked to see so much as one complaint to determine what information the attorneys were potentially exposing to the public. We have no reason to believe that the factual predicate for our holding is widespread.

We also fail to discern how the obligations imposed by New Jersey statutory and regulatory law can have the far-reaching consequences envisioned by amici, particularly for psychologists practicing in other states or subject to HIPAA. Amici have not argued that other states have statutes or regulations identical or similar to the PPLA and its regulations.

Finally, we note that to qualify for Board membership, a person must "either be a member of or have professional standing equivalent to that required for classification as a member of the New Jersey Psychological Association and the American Psychological Association." N.J.S.A. 45:14B-10(b). In addition, each member, at the time of appointment, "shall have been for at least [five] years prior thereto, actively engaged as a psychologist in one or more phases or branches of psychology or in the education and training of doctoral or postdoctoral students of psychology or in psychological research, and shall have spent the major portion of

the time devoted by him to such activity, during the [two] years preceding his appointment, in this State." N.J.S.A. 45:14B-10(c). Considering factors that include the breadth of the Board's experience, the clear statutory and regulatory law, the authority on which the Board based its decision, and Dr. Helfmann's apparent failure to consider either the PPLA or its implementing regulations when, for twenty-five years, he disclosed confidential patient information to collection attorneys, we find amici's concerns uncompelling.

## IV.

We turn to the appropriateness of the sanctions the Board imposed. An appellate court's review of an agency's choice of disciplinary sanctions is limited. In re License Issued To Zahl, 186 N.J. 341, 353 (2006). "The court has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." In re Polk, 90 N.J. 550, 578 (1982). For these reasons, "[a] reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'" In re Herrmann, 192 N.J. 19, 28 (2007) (quoting Polk, 90 N.J. at 578). The test is "whether such punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." Polk, 90 N.J. at 578 (quoting Pell v. Bd. of Educ., 313 N.E.2d 321, 326 (N.Y. 1974)). "The threshold of

38                                                                                                      A-4975-17T3

'shocking' the court's sense of fairness is a difficult one not met whenever the court would have reached a different result." Herrmann, 192 N.J. at 29.

Preliminarily, we note the Board afforded Dr. Helfmann the opportunity "to raise any issues regarding ability to pay[.]" The Board informed Dr. Helfmann he could submit certain financial information the Board would consider in determining sanctions. We do not discern from the record that Dr. Helfmann submitted any financial information concerning his ability to pay sanctions.

A board is authorized to suspend the license of a person who has "engaged in repeated acts of negligence" or "[h]as engaged in professional or occupational misconduct as may be determined by the board" or "[h]as violated or failed to comply with the provisions of any act or regulation administered by the board[.]" N.J.S.A. 45:1-21(d), (e), and (h). In addition to suspending a person who has committed any such violations, boards are authorized to impose a civil penalty "of not more than $10,000 for the first violation and not more than $20,000 for the second and each subsequent violation." N.J.S.A. 45:1-25(a). A board also "may order the payment of costs for the use of the State, including, but not limited to, costs of investigation, expert witness fees and costs, attorney fees and costs, and transcript costs." N.J.S.A. 45:1-25(d).

A-4975-17T3

Considering the totality of circumstances surrounding Dr. Helfmann's breach of patient confidentiality, we cannot conclude that either his suspension or the imposition of a $10,000 penalty was shocking to one's sense of fairness. Dr. Helfmann, by his own admission, has been providing the Partnership's patients' personal health information to collection attorneys for twenty-five years or longer. During the OAL hearing, twenty-two Superior Court complaints against patients were identified, each including CPT and DSM codes. Though Dr. Helfmann testified he would not have permitted his attorneys to include the information had he known they were doing so, when asked by his former patient to remove the information the doctor refused to do so, on the advice of his attorney. Consequently, the former patient was forced to have his attorney seek relief in Superior Court.

Nor can we conclude that either the suspension or the $10,000 civil penalty resulted in a financial hardship to Dr. Helfmann, as he declined to provide any personal financial information. Considering Dr. Helfmann's longstanding violations of his statutory, regulatory, and professional obligations, the collective experience of Board members, Dr. Helfmann's refusal to provide financial information, and our deferential standard of review, we find no basis in the record for overturning the Board's decision. In short, we have no basis for concluding that either the suspension or the $10,000 civil penalty was inappropriate.

A-4975-17T3

Last, we address the Board's imposition of fees and costs. The Legislature has determined that "[i]n any action brought pursuant to this act, a board or the court may order the payment of costs for the use of the State, including, but not limited to, costs of investigation, expert witness fees and costs, attorney fees and costs, and transcript costs." N.J.S.A. 45:1-25(d). The approach to be used in analyzing an award of fees and costs "is analogous to that involved in the awarding of counsel fees." Poritz v. Stang, 288 N.J. Super. 217, 221 (App. Div. 1996).

The Board's award of costs included $597.78 for investigative costs, $12,543.75 for expert costs, and $4435.05 for transcripts. The Board did not find these costs excessive, nor is there anything in the record to suggest they exceeded reasonable amounts charged for such services.

The Board carefully evaluated the number of hours the Deputy Attorney General expended in prosecuting the case, as well as the hourly rate the Attorney General utilized when computing fees. The Board evaluated the proposed hourly rate in terms of the Deputy Attorney General's "wealth of experience in prosecuting actions involving professional board licenses." Nothing in Dr. Helfmann's opposition persuades us the Board abused its discretion or otherwise erred in its determination of the reasonableness of the hours expended by the Attorney General or the proposed hourly rate. The Board properly multiplied these two factors to

41

compute the "lodestar" portion of the fee. See Rendine v. Pantzer, 141 N.J. 292, 334-40 (1995) (explaining construct for determining the reasonableness in awarding fees in statutory fee-shifting cases). The Board reduced the fee by forty percent based on the outcome of the case and other factors, and assessed Dr. Helfmann $92,965.50 for attorney's fees.

Significantly, when determining the amount of fees and costs to award, consideration must be given to "the interest to be vindicated in the context of the statutory objectives, as well as any circumstances incidental to the litigation that directly or indirectly affected the extent of counsel's efforts." Szczepanski v. Newcomb Med. Ctr., 141 N.J. 346, 366-67 (1994). Among other things, consideration should be given to "the extent to which a defendant's discovery posture, or a plaintiff's, has caused any excess expenses to be incurred." Id. at 366.

Here, the core facts of the case were undisputed. Dr. Helfmann ultimately admitted that for twenty-five or more years he had been providing information concerning patients' diagnoses and treatment to collection attorneys. He stipulated to twenty-two complaints that had been filed and that ultimately were redacted pursuant to court orders entered on motions filed by the adult patient's attorney. His defense was that he acted on the advice of counsel.

42

The doctor's motion practice and filing of a Superior Court action in an effort to have the administrative action dismissed could be characterized as "scorched earth" litigation. We understand the doctor's efforts. His reputation was at stake. But his approach to the litigation caused the Attorney General to spend considerable time and effort that was needless and unnecessary. This was an appropriate factor for the Board to consider when determining fees and costs.

The Board considered the Attorney General's application for fees and costs under longstanding and settled criteria for evaluating such applications. Nothing in the record suggests the Board abused its discretion in doing so.

In his third argument point, Dr. Helfmann asserts the record-keeping charge was a mere technical violation that does not rise to the level of a suspendable offense. The Board imposed the suspension for serious confidentiality breaches and the record-keeping violation, not merely for the record-keeping violation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43